*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0300p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

—————————

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee*,

  *v.*

GARY JOHN MIKULICH,
  *Defendant-Appellant*.

No. 12-1732

>

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:11-mj-00011-1—R. Allan Edgar, District Judge.

Argued: May 1, 2013

Decided and Filed: October 22, 2013

Before: BATCHELDER, Chief Judge; GUY and BOGGS, Circuit Judges.

—————————

## COUNSEL

**ARGUED:** Clare E. Freeman, FEDERAL PUBLIC DEFENDER'S OFFICE, Marquette, Michigan, for Appellant. Maarten Vermaat, UNITED STATES ATTORNEY'S OFFICE, Marquette, Michigan, for Appellee. **ON BRIEF:** Clare E. Freeman, Paul A. Peterson, FEDERAL PUBLIC DEFENDER'S OFFICE, Marquette, Michigan, for Appellant. Maarten Vermaat, UNITED STATES ATTORNEY'S OFFICE, Marquette, Michigan, for Appellee.

—————————

## OPINION

—————————

BOGGS, Circuit Judge. The Federal Bureau of Investigation arrested Gary John Mikulich in March 2011 on suspicion that he planted an explosive device outside the McNamara Federal Building in Detroit, Michigan, in February of the same year. During his initial appearance, Mikulich exhibited erratic behavior, raising questions as to his competency to stand trial. After he was adjudged incompetent and remanded for

1

treatment, the Government requested that he be forcibly medicated with antipsychotic drugs. Mikulich opposed this motion, arguing that the Government lacked a sufficiently important interest in trying him due to the special circumstances of this case. Though he acknowledged the grave nature of the charges against him, he claimed that he faces civil confinement in the absence of criminal sanction and that he intends to raise an insanity defense at trial. The magistrate judge rejected these arguments on the ground that they were too speculative to override the Government's interest in trying this matter. The district court agreed and adopted the magistrate judge's findings. We affirm this decision.

I

In February 2011, a security officer found a canvas tool bag on the street outside the McNamara Federal Building. Believing the item to be lost property, the officer stored the bag in the building for three weeks without inspecting it. Eventually, someone performed an x-ray scan of the bag and discovered wires, electronic components, and other objects consistent with an explosive device. The Detroit Police Bomb Squad took possession of the bag and detonated it. The procedure resulted in a sizable secondary explosion, leading the FBI to conclude that the item was in fact a bomb.

The tool bag containing the bomb was sold exclusively at a chain hardware store. The store also sold the particular type of timer used in the device. The FBI discovered a transaction in February 2011, several days before the bag was found, in which a customer purchased both of these items. Subsequent investigation led to the identification of Mikulich as the man who made the purchase and placed the bag outside the building. Federal officials arrested him in March 2011 and charged him with one count each of attempting to destroy a government building by means of explosive while creating a substantial risk of injury to a person, in violation of 18 U.S.C. § 844(f)(1)–(2), using and carrying a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii), and possessing an unregistered destructive device, in violation of 26 U.S.C. § 5861(d).

Mikulich appeared before a federal magistrate judge following his arrest. During his initial appearance, he began behaving in a bizarre manner.[1] The magistrate judge ordered a psychiatric evaluation to determine Mikulich's competency to proceed to trial. The evaluation, completed in July 2011, concluded that Mikulich suffered from an array of intricate, deep-seated delusions brought upon by paranoid schizophrenia and that he lacked sufficient competency to proceed to trial at the time. The magistrate judge agreed with these findings and, pursuant to 18 U.S.C. § 4241(d), committed Mikulich to the custody of the Attorney General to undergo treatment. Six months later, the warden of the facility to which Mikulich was sent tendered a letter and report indicating that he remained incompetent to stand trial and refused to take medication. The warden recommended involuntary treatment with psychotropic drugs. The magistrate judge held a second competency hearing and determined that, pursuant to the four-factor test laid out in *Sell v. United States*, 539 U.S. 166 (2003), involuntary medication was warranted.

Mikulich appealed to the United States District Court for the Western District of Michigan. *See* W.D. Mich. LCrR 57.2(e); W.D. Mich. LCivR 72.3(a). Though he conceded that three of the four *Sell* factors were satisfied, Mikulich claimed that the Government lacked a sufficiently important interest in bringing him to trial, so as to override his Fifth Amendment liberty interest in being free from involuntary medication. He admitted that the crimes of which he is charged are serious, but stated that he faces civil confinement if not prosecuted and that he plans to raise an insanity defense at his trial, thus lessening the Government's interest in trying him. The district court rejected this argument and adopted the findings of the magistrate judge. Mikulich filed a timely interlocutory appeal with this court.

---

[1] According to the magistrate judge, Mikulich claimed that he was once President of the United States, Co-Governor of California, a Secret Service Agent, and a Deputy United States Marshal. His odd behavior continued throughout the proceedings below. Mikulich filed two *pro se* documents with the magistrate judge, claiming, *inter alia*, that he is an uncredited song writer for the bands Steely Dan, Aerosmith, and Mötley Crüe (to which a fellow inmate and alleged former saxophonist for Steely Dan could aver), that a Cold War era satellite system (which, along with the Pentagon, was responsible for the September 11, 2001 terrorist attacks) was attacking and "erasing" his contacts in the government, and that members of the FBI stationed in Detroit had stolen over $1 billion dollars in "various large monetary funds" from him. He further intimated that there is some link between his incarceration and the deaths of Michael Jackson, Whitney Houston, and Steve Jobs. He asserts that no one else recalls this because of constant attacks by the aforementioned satellite system.

II

An individual has a constitutionally protected liberty interest in avoiding the unwanted administration of medication, and the Government may not deprive him of this liberty without an essential or overriding interest in doing so. *Sell*, 539 U.S. at 178–79. The Government may force medication upon an inmate in order to restore his competency to stand trial under certain circumstances, as the Government has a recognized interest in protecting "the basic human need for security" through the prompt administration of criminal justice. *Id.* at 180. Pursuant to *Sell*, the Government must present clear and convincing evidence of four factors in order to secure an order of involuntary medication: "(1) the existence of an 'important' governmental interest; (2) that involuntary medication will 'significantly further' the government interest; (3) that involuntary medication is 'necessary' to further those interests; and (4) that administration of the drugs must be 'medically appropriate' for the individual defendant." *United States v. Green*, 532 F.3d 538, 545 (6th Cir. 2008) (quoting *Sell*, 539 U.S. at 180–81).

The current matter involves only the first of these factors—the existence of an "important" governmental interest. The Government has an important interest in prosecuting a defendant if he is charged with a "serious" crime and no "special circumstances" diminish the necessity of prosecution. *Sell*, 539 U.S. at 180; *Green*, 532 F.3d at 545–46, 551; *see also United States v. Evans*, 404 F.3d 227, 236–40 (4th Cir. 2005) (applying the same two-step analysis). We have previously addressed the first element of the *Sell* analysis as a question of law reviewed under a *de novo* standard. *Green*, 532 F.3d at 545. As in *Green*, the present case contains no issues of fact, and a *de novo* standard is accordingly appropriate for the entirety of our analysis. *See Evans*, 404 F.3d at 236 ("The district court's determination that the government's interest is 'important' is a legal conclusion that we review de novo, although we review any factual findings relevant to this legal determination for clear error." (citations omitted)).

III

Generally, the Government has an important interest in trying an individual accused of a "serious" crime. *Sell*, 539 U.S. at 180. The Supreme Court did not define what makes a crime "serious" for the purposes of involuntary medication; however, this circuit looks to the maximum penalty authorized by statute. *Green*, 532 F.3d at 547–48. This objective measure not only respects the legislature's fundamental role in determining the seriousness of a particular type of criminal behavior, but also reduces the potential for arbitrariness inherent in the consideration of more subjective factors. *Id.* at 548.

While we have not set a numeric threshold at which a crime may be deemed "serious," we held in *Green* that the punishment for possession of crack cocaine, which at the time carried a mandatory minimum of 10 years and a maximum of life in prison, manifested a sufficient degree of seriousness to warrant involuntary medication. Here, Mikulich faces a combined mandatory minimum of 37 years, with a maximum penalty of life. Furthermore, and unlike *Green*, the charges in this case unquestionably relate to violent behavior and carry a unique governmental interest, in that Mikulich is charged with attempting to bomb a federal building. Mikulich himself concedes that the charges are very serious. Appellant's Br. 12. The first element is therefore satisfied.

Even if the Government has an important interest in prosecuting a particular type of crime, we must "consider the facts of the individual case" to determine if special circumstances lessen the Government's interest in taking the matter to trial. *Sell*, 539 U.S. at 180; *Green*, 532 F.3d at 551. "The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill," which may diminish the risks that ordinarily attach to freeing a perpetrator of a serious crime without punishment. *Sell*, 539 U.S. at 180. "The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed . . . )." *Ibid.* No single factor necessarily controls this analysis. *See United States v. Bush*, 585 F.3d 806, 814–15 (4th Cir. 2009) (holding that, despite a serious argument that the defendant

had already served the vast majority of the time to which she could potentially be sentenced, the Government maintained an important interest in prosecuting and convicting the defendant).

Mikulich claims that two such circumstances militate against involuntary medication in this case: the possibility that he will be civilly committed in the absence of prosecution, and the possibility that he will raise an insanity defense at trial. The Government counters that Mikulich has adduced no evidence of either circumstance, thus leaving him to rely upon bare uncertainty as to the outcome of the case. Mikulich does not dispute this assertion. Rather, he cites this court's recent opinion in *United States v. Grigsby*, 712 F.3d 964 (6th Cir. 2013), for the proposition that uncertainty is enough to undermine the Government's interest in prosecution. This argument, however, stretches the holding of this court's opinion far beyond that necessary to support the outcome. *Grigsby* turned on two key factual distinctions, neither of which is present here: testimony that the Government planned to initiate a civil-commitment proceeding if Grigsby were not prosecuted, and the potential for a relatively low Guideline sentence that would have mostly been served by the time Grigsby reached trial. We find the case to be distinguishable and Mikulich's argument unpersuasive.

A

We begin with an examination of *Grigsby*. Dennis Grigsby was arrested after committing a string of unarmed bank robberies in and around Columbus, Ohio. The Government brought a three-count federal indictment against him for violation of 18 U.S.C. § 2113(a). Soon after his detention, he was diagnosed with paranoid schizophrenia and remanded to the custody of the Attorney General for treatment. *Grigsby*, 712 F.3d at 965–66. The Government moved for involuntary medication under *Sell* after Grigsby refused treatment for his condition. *Id.* at 967. Grigsby challenged the motion, expressing concern as to the drugs' efficacy, the potential for serious side effects, and, most relevant to our case, the strength of the Government's interest in prosecuting him in light of the circumstances of the case. *Id.* at 967–68. Like Mikulich,

Grigsby claimed that he faced a lengthy period of involuntary commitment in the absence of prosecution and that he had a meritorious insanity defense.

During an evidentiary hearing, Grigsby elicited testimony from the Government's psychiatrist that, absent forced medication and prosecution, medical staff intended to move for civil commitment. Without medication, the doctor opined, Grigsby would remain psychotic, and though he had shown no indicia of dangerousness within the structured confines of a federal psychiatric hospital, he may not be fit for release into society at large. *Ibid.* Grigsby followed this with testimony from his own medical expert, a clinical psychologist, who claimed that Grigsby may well have been mentally ill during his crime spree and that he believed that Grigsby could pursue an insanity defense if brought to trial. *Id.* at 968. After the hearing, the district court granted the Government's motion, finding Grigsby's objections to be too speculative to defeat the Government's interest in prosecuting a concededly serious criminal offense. *Ibid.*

A divided panel of this circuit reversed the *Sell* order and remanded the matter to the district court for a civil-commitment hearing under 18 U.S.C. § 4246. The majority roundly criticized the district court's opinion. However, the outcome of the case turns on two specific faults. The majority first cited the lower court for completely ignoring "significant evidence" that Grigsby "may face a lengthy civil commitment due to his mental illness . . . . " *Grigsby*, 712 F.3d at 970. It specifically highlighted the testimony from the Government psychiatrist that a civil-commitment proceeding was a very real possibility for Grigsby were he not medicated and taken to trial. *Ibid.* The district court gave no apparent consideration to this testimony, focusing instead on the speculative nature of Grigsby's potential for hospitalization under 18 U.S.C. § 4243 following a finding of insanity at trial. *Id.* at 970–71.

In light of the availability of an alternative, the majority went on to consider the societal benefit that would inure from forcing medication upon Grigsby, namely his potential sentence. The majority calculated Grigsby's Guideline sentence to be 41 to 51 months. *Id.* at 974. At the time of his appeal, he had been in custody for 33 months, about 65% of the low-end Guideline range. *Ibid.* Based on the record, the majority

estimated that it would take between 4 and 12 months to restore his sanity.  *Ibid.*
Assuming a best-case scenario of a four-month recovery, Grigsby would have served
37 months—over 90% of his low-end Guideline sentence—before the Government
would have even brought him to trial.  The majority ultimately concluded that this
meager benefit did not justify the cost to Grigsby's constitutional rights, particularly in
light of the likelihood for civil commitment.  *Id.* at 976.

B

In contrast to Grigsby, Mikulich presents no evidence, let alone significant
evidence, to support his challenge to the *Sell* order.  Rather, he claims that neither the
district court nor this court can know the outcome of a civil-commitment hearing or the
merit of his insanity defense.  His contention is undoubtedly true: we are judges, not
oracles, and thus necessarily have a degree of uncertainty about future events.  However,
reliance upon this obvious fact is not enough to prevail.  While the ultimate burden of
proving an important interest in prosecution always remains with the Government, we
look to the defendant to demonstrate that the special circumstances of his case
undermine the Government's interest once it is established that he stands accused of a
serious crime.  *See Green*, 532 F.3d at 551; *Evans*, 404 F.3d at 239–40.  Mikulich has
failed to do so.

To determine whether Mikulich has demonstrated a sufficient likelihood of his
civil commitment, we look to both federal law and the law of the state in which he is
being prosecuted, in this case, Michigan.  *United States v. Bradley*, 417 F.3d 1107,
1116–17 (10th Cir. 2005).  Under both the laws of the United States and the laws of
Michigan, civil commitment requires clear and convincing evidence that Mikulich is so
disabled that he is a serious danger to himself or others.  *See* 18 U.S.C. § 4246(a)
(permitting institutionalization of a person in custody who is due for release only if that
person "is presently suffering from a mental disease or defect as a result of which his
release would create a substantial risk of bodily injury to another person or serious
damage to property of another"); Mich. Comp. Laws § 330.1401(1)(a)–(d) (defining a
"person requiring treatment" as an individual who generally can be expected to cause

serious physical harm to himself or others or who lacks the ability to attend to basic needs).

As stated in *Grigsby*, a defendant is not required to manifest an absolute certainty of future civil confinement in order to undermine the Governments interest in prosecution. 712 F.3d at 972. However, this does not mean that *uncertainty* will carry the day. Quite to the contrary, our sister circuits have held "that the government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain." *United States v. Gutierrez*, 704 F.3d 442, 450 (5th Cir. 2013) (citing *United States v. Nicklas*, 623 F.3d 1175, 1178–79 (8th Cir. 2010); *United States v. Palmer*, 507 F.3d 300, 304 (5th Cir. 2007); *United States v. Bradley*, 417 F.3d 1107, 1116–17 (10th Cir. 2005); *United States v. Evans*, 404 F.3d 227, 239 (4th Cir. 2005); *United States v. Gomes*, 387 F.3d 157, 161 (2d Cir. 2004)). We join them in this opinion.

The record before us shows nothing beyond complete uncertainty as to whether Mikulich would face civil commitment under either federal or state law. Both psychiatric evaluations in the record state that Mikulich has no prior record of violent behavior, save one episode in his early twenties in which he slapped his mother. During his incarceration, he has been cooperative and nonviolent. Mikulich proffers no other relevant data in the record, and we cannot find any. This evidence supports, at best, an uncertain probability of civil commitment. This is insufficient to undermine the Government's interest in prosecuting Mikulich.

## C

Mikulich next asserts that: "It is likely that [he] will plead insanity should this case ever go to trial. An insanity defense cuts against the government's interest in prosecution." Appellant's Br. 12 (citations omitted). He does not explain how such a plea would undermine the Government's interest in prosecution, nor does he present any evidence suggesting that he would prevail on such a theory. More fundamentally, he assumes that a possible insanity defense is a relevant "special circumstance" under *Sell*, without addressing contrary authority by one of our sister circuits. We conclude that it is not. Furthermore, even if we were to assume *arguendo* that an insanity defense is

relevant to the *Sell* calculus, Mikulich has presented insufficient evidence to demonstrate any appreciable likelihood of his success on the merits of the defense, and has thus failed to undermine the Government's interest in prosecution.

1

In a passing comment, the majority in *Grigsby* asserted: "That Grigsby potentially may be found not guilty by reason of insanity, even if he is restored to mental competency to stand trial, is a special circumstance that should have been fully considered in weighing the government's interest in prosecution." 712 F.3d at 970. As one must infer from our prior discussion of *Grigsby*, the majority's consideration of this argument was not central to the outcome of the case. Moreover, both sides in *Grigsby* appear to have simply assumed that an insanity defense was germane to the first *Sell* factor, and therefore did not address the same issue that we do here. *See id.* at 970–71 (citing, without additional analysis, three unpublished district court opinions, all of which similarly accept, without reasoning, that an insanity defense was relevant to a *Sell* claim).

During the pendency of this appeal, the Fifth Circuit published its opinion in *United States v. Gutierrez*, 704 F.3d 442 (5th Cir. 2013). We find *Gutierrez* to be instructive here: The defendant, accused of threatening to kill a number of current and former federal officials (including President Obama and former Presidents George H.W. Bush and George W. Bush), challenged the Government's interest in prosecuting him in light of "the significant, uncontested evidence of his insanity at the time of the offense." *Id.* at 446–47. To be sure, the nature of his crimes spoke volumes as to his mental state at the time,[2] a fact that the panel acknowledged in finding "little doubt that Gutierrez [would] ultimately be found insane . . . ." *Id.* at 447.

---

[2] "In November and December of 2008, Gutierrez made over one hundred telephone calls to a television station in Austin, Texas, threatening to harm or kill former President George W. Bush, Texas Governor Rick Perry, and both of their wives. This prompted an investigation by the Secret Service and a visit to Gutierrez by a Secret Service Agent, Nguyen Vu. On August 27, 2009, Gutierrez called Agent Vu and left a message on his voice mail. Gutierrez claimed to be delivering a message from God, and threatened to kill President Obama, former Presidents George W. Bush and George H.W. Bush, Agent Vu, and 'all lawyers.'" *Id.* at 444.

Notwithstanding, the court held that "even if it were certain that Gutierrez would successfully plead not guilty by reason of insanity, the government would continue to have an interest in prosecution . . . . " *Id.* at 452. The unanimous panel reasoned that "the shifted burden of proof for insanity acquittees in civil commitment proceedings" makes prosecution of these cases of interest to the Government. *Ibid.* This is certainly true: pre-trial civil commitment and post-trial hospitalization of an insanity acquittee are not equivalent. A finding of insanity shifts the burden from the Government to the insanity acquittee, who must prove that he is *not* dangerous before he may be released. *Compare* 18 U.S.C. § 4243(d) (hospitalization of a person found not guilty only by reason of insanity), *with id.* § 4246(d) (hospitalization of a person due for release but suffering from mental disease or defect).

We find the Fifth Circuit's logic to be eminently reasonable. We add to it by observing that affirmative defenses such as insanity are strikingly different from the two examples of special circumstances announced in *Sell*. Unlike the possibility of civil commitment or the relative length of time already served for the crime, an insanity defense relates to the triable merits of the case. To be sure, this defense is of no real value to Mikulich until the Government has presented its case-in-chief and survived a motion for acquittal at trial. *See* Fed. R. Crim. P. 29(a). Further to the point, an insanity defense is typically pursued as a fall-back in addition to a defense against the merits of the Government's case. *See* 18 U.S.C. § 4242(b) (distinguishing a verdict of "not guilty" from a verdict of "not guilty only by reason of insanity"). It is a defensive theory that accepts that the accused may well be proven to have committed the criminal acts beyond a reasonable doubt, but "as a result of a severe mental disease or defect, [he] was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). It is fully contingent upon the occurrence of a condition precedent—the Government taking the case to trial and surviving a Rule 29 motion. It is thus logically backwards to say that a potential insanity defense may somehow lessen the value of the condition precedent coming to pass in the first instance. Accordingly, we join the Fifth Circuit in holding that, where the Government has already demonstrated an important interest in

prosecuting the defendant, the potential assertion of an insanity defense does not undermine the Government's interest in taking the case to trial.

2

Even if we were to assume that an insanity defense could defeat the Government's interest in prosecuting a serious crime, Mikulich cites no evidence tending to prove that he, "as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." *See ibid.* He has not explicated his theory of insanity or produced any relevant expert reports. Indeed, it is not even clear that Mikulich will raise an insanity defense at trial. *See* Appellant's Br. 12 ("It is *likely* that Mr. Mikulich will plead insanity should this case ever go to trial." (emphasis added)). As the record currently stands, Mikulich would not even meet his burden to put insanity into issue at trial, let alone prove it by clear and convincing evidence as required by statute. *See* 18 U.S.C. § 17(b); *see also Dixon v. United States*, 548 U.S. 1, 14 (2006) (stating that "the one relying on an affirmative defense must set it up and establish it"). Furthermore, nothing in the record indicates that Mikulich has given the Government notice of his intent to raise a defense of insanity as required by Rule 12.2 of the Federal Rules of Criminal Procedure. As pointed out by the magistrate judge, the district court, and the Government, Mikulich's argument is far too speculative to be persuasive, even on its own terms.

IV

While we should not take lightly the decision to medicate a defendant against his will, we also should not discount the Government's interest in bringing an accused would-be terrorist to justice. Mikulich has not demonstrated that any special circumstances of this case weaken the Government's clear interest in trying him for the serious crimes of which he stands accused. We **AFFIRM** the ruling of the district court.