**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0678n.06

No. 20-5206

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 01, 2020
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| **Plaintiff–Appellee,** | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| v. | ) COURT FOR THE MIDDLE |
| | ) DISTRICT OF TENNESSEE |
| JAMES SHERRILL, | ) |
| | ) |
| **Defendant–Appellant.** | ) **OPINION** |
| | ) |
| | ) |

**Before: MOORE, GILMAN, and GRIFFIN, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** James Sherrill, a pretrial detainee with drug-induced psychosis, appeals the district court's order granting the government's motion for involuntary medication to restore his competency for trial. For the reasons set forth in this opinion, we **AFFIRM** the district court's order to medicate Sherrill involuntarily.

**I. BACKGROUND**

In June 2017, the government indicted Sherrill for one count of conspiracy to distribute Oxycodone and methamphetamine, in violation of 21 U.S.C. § 846; one count of distribution of Oxycodone, in violation of 21 U.S.C. § 841(a)(1); and three counts of distribution of five grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). R. 8 (Indictment at 1–4) (Page ID #14–17). Sherrill's charges arose from three sales of illegal drugs to a confidential source. *See id.*; R. 3 (Compl. at 3–6) (Page ID #7–9).

In an order dated August 14, 2017, the district court directed a psychiatric or psychological evaluation of Sherrill to determine whether he was competent to stand trial. R. 28 (Order for Psychiatric or Psych. Evaluation of Def. at 1) (Page ID #96). The district judge then entered an order requiring that Sherrill be committed to the Attorney General's custody for evaluation at a suitable facility. R. 35 (Order) (Page ID #109). Dr. Jeremiah Dwyer, Ph.D., a forensic psychologist employed by the Federal Bureau of Prisons ("BOP"), diagnosed Sherrill with substance-induced psychotic disorder, substance use disorder, and potentially antisocial personality disorder, and concluded that he "does suffer from a mental disorder that significantly impairs his present ability to understand the nature and consequences of the court proceedings against him." R. 45 (Dwyer Psychiatric Evaluation at 8, 16) (Page ID #130, 138).

After the district court reviewed the government's competency evaluation and conducted a competency hearing, it determined that Sherrill was not competent to stand trial and committed him to the Attorney General's custody to determine if the BOP could render Sherrill competent. R. 48 (Order Committing the Def.) (Page ID #141–42). The BOP transferred him to the Mental Health Unit of Federal Medical Center-Butner ("FMC-Butner") for evaluation. R. 54 (Letter from Warden J.C. Holland at 1) (Page ID #152).

On August 9, 2018, the Warden of FMC-Butner filed a certificate, pursuant to 18 U.S.C. § 4241(d), stating that the center had found that Sherrill was not competent to stand trial. R. 60 (Letter from Warden) (Page ID #184). Dr. Adeirdre Stribling Riley, a forensic psychologist at FMC-Butner, diagnosed Sherrill with inhalant use disorder, stimulant use disorder, inhalant-induced psychotic disorder, amphetamine-induced psychotic disorder, and antisocial personality disorder. *Id.* (Riley Report at 12) (Page ID #195). Her report stated that Sherrill's "symptoms of

psychosis, clairvoyance, and personality disturbance" would impair "his rational understanding and ability to assist in his defense." *Id.* at 19 (Page ID #202). Despite Sherrill's significant mental health conditions and substance abuse history, she concluded that "there is a substantial likelihood that Mr. Sherrill may improve to such an extent his competency to proceed may be improved in the foreseeable future with medication treatment." *Id*.

Throughout this case, Sherrill has refused to take the recommended antipsychotic medication for his mental health conditions. R. 121 (*Sell* Hr'g Tr. at 30) (Page ID #399). Much of Sherrill's reticence to take medication stems from his prior negative experiences with medication. When he was administered fluoxetine (Prozac) in 2002 or 2003, he reported that "he perceived [taking the medication] as them poisoning him and said that as a result of taking the Prozac, he was forced to pull out his toenails and his fingernails." *Id.* at 8 (Page ID #377); *see also* R. 45 (Dwyer Forensic Evaluation at 5) (Page ID #128); R. 60 (Riley Psychiatric Rep. at 4) (Page ID #187) (reporting that Prozac "damn near killed me"). He also cited negative experiences that his family has had with psychiatric medication. He reported that his mother was previously hospitalized for mental health concerns and treated with medication, and "that after the medication, she went crazy." R. 121 (*Sell* Hr'g Tr. at 8) (Page ID #377). After his uncle began taking medication, Sherrill stated that his uncle "went crazy." *Id.* Sherrill also refuses to take medication because he does not believe that he has a mental illness. *Id.* at 90–91 (Page ID #459–60); *see also* R. 45 (Dwyer Psychiatric Report at 7) (Page ID #129) (reporting that Sherrill has "denied any current or past mental health concerns").

In light of Sherrill's continued refusal to take antipsychotic medications, FMC-Butner requested that the district court issue an order permitting involuntary medication of Sherrill to

restore his competency. R. 60 (Riley Psychiatric Rep. at 18–20) (Page ID #201–03). The government subsequently filed a Motion for Involuntary Medication to restore Sherrill to competency. R. 62 (Mot. for Involuntary Medication to Restore Def. to Competency) (Page ID #206–07).

Upon the government's Motion for Involuntary Medication, the district court conducted a *Sell* hearing.[1] The government submitted the testimony and written reports of Dr. Logan Graddy, the chief psychiatrist at FMC-Butner, R. 70 (Graddy Forensic Addendum & Treatment Plan) (Page ID #221–225); R. 70-1 (*Sell* App.) (Page ID #226–237), and Dr. Adeirdre Stribling Riley, a forensic psychologist at FMC-Butner, R. 60 (Riley Psychiatric Rep.) (Page ID #184–203). In opposition to the government's Motion for Involuntary Medication, Sherrill relied on the written report and testimony of Dr. Lyn McRainey, a psychologist, R. 87-1 (Forensic Evaluation Rep.) (Page ID #274–81), and the written report of Dr. Stephen Montgomery, the Director of Vanderbilt University's Forensic Psychiatry group, R. 96-1, (Forensic Evaluation) (Page ID #312–13).

Dr. McRainey conducted a four-hour-long evaluation of Sherrill and reviewed his mental health records. R. 87-1 (McRainey Psychological Report at 5) (Page ID #278). She diagnosed Sherrill with drug-induced psychosis and potentially Post-Traumatic Stress Disorder. R. 121 (*Sell* Hr'g Tr. at 32–33) (Page ID #401–02). She agreed with the other experts that antipsychotic medication would be helpful to Sherrill's mental health and competency. *Id.* at 17, 19 (Page ID #386, 388). However, she recommended that the BOP first make "a sincere and intense effort to establish some level of rapport with him" to persuade him to agree to try medication before

---

[1]The hearing is named for *Sell v. United States*, 539 U.S. 166 (2003), which governs requests to permit involuntary medication of a pretrial detainee when they are not a danger to themselves or others.

resorting to involuntary medication. *Id.* at 10 (Page ID #379); *see also* R. 87-1 (McRainey Psychological Report at 7) (Page ID #280) ("Mr. Sherrill should be given the opportunity to participate in a therapeutic relationship with a mental health provider who can establish rapport and eventually provide support to Mr. Sherrill regarding issues of medication."). Building the necessary rapport would require therapeutic sessions two to three times a week, for six months. R. 121 (*Sell* Hr'g Tr. at 11) (Page ID #380). She contended that forcing a patient to take a medication over their objection could negatively impact the "life effectiveness" or "behavioral expression" of the medication, although she admitted that it would not impact the "chemical effectiveness" of the medication. *Id.* at 14–16 (Page ID #383–85). Forced medication would only "feed into Mr. Sherrill's delusions about what we do, what law enforcement does, what the mental health profession does." *Id.* at 20 (Page ID #389); *see also* R. 87-1 (McRainey Psychological Report at 7–8) (Page ID #280–81) ("Given the strength of Mr. Sherrill's delusions and the force of his refusal, it is difficult to imagine that giving him medication against his will is going to be successful.").

Defendant's psychiatric expert, Dr. Montgomery, reviewed the reports of experts and Sherrill's medical records, although he did not personally evaluate Sherrill. R. 96-1 (Forensic Evaluation) (Page ID #312–13). He "concurred with the majority of the evaluators that Mr. Sherrill's mental health could be improved with antipsychotic medications" and that these medications "will likely enable Mr. Sherrill to be restored to competency to stand trial." *Id.* at 1 (Page ID #312). These medications are the "standard treatment" for psychosis and should at least reduce the intensity of Sherrill's delusions. *Id.* Dr. Montgomery specifically recommended newer antipsychotic medications, such as aripiprazole (Abilify), because they have fewer side effects

than older antipsychotic medications. *Id.* at 1–2 (Page ID #312–13). Dr. Montgomery did not testify at Sherrill's *Sell* hearing, but defense counsel introduced his report into the record. R. 121 (*Sell* Hr'g Tr. at 36) (Page ID #405).

The government's experts, Dr. Logan Graddy and Dr. Adeirdre Stribling Riley, agreed that medication is necessary to bring Sherrill to competency to stand trial and treat his underlying mental illness. Dr. Riley testified that "antipsychotic medication is the standard treatment for psychotic disorder." R. 121 at 56 (Page ID #425). According to Dr. Riley and Dr. Graddy, there is a high likelihood that Sherrill would be restored to competency with medication. *Id.* at 55 (Page ID #424).

Dr. Logan Graddy, a psychiatrist, described the medication they were considering prescribing to Sherrill and its side effects. His preference was to treat Sherrill with haloperidol (Haldol), an antipsychotic medication. *Id.* at 109 (Page ID #478); R. 70 (Graddy Forensic Add. & Treatment Plan at 5) (Page ID #225). He chose this medication because it is well-studied and better tolerated than other antipsychotic medications. R. 121 (*Sell* Hr'g Tr. at 109–12) (Page ID #478–81). Practically, Haldol also has a short-acting injectable formulation, which would allow the facility to ensure that the medication does not cause any serious side effects before placing Sherrill on a long-lasting formulation. *Id.* at 108 (Page ID #477). Dr. Graddy acknowledged that antipsychotic medication can have severe, even fatal, side effects, such as sudden death from heart arrhythmias and neuroleptic malignant syndrome, but he noted that these side effects are exceedingly rare. *Id.* at 117–18 (Page ID #486–87). Other serious side effects, such as diabetes, high cholesterol, high blood pressure, and neuromuscular conditions are uncommon, and Dr. Graddy assured the district court that the facility will monitor Sherrill for these side effects and

change the medication type or dosage or provide adjuvant medication if necessary. *Id.* at 121 (Page ID #490) (describing the metabolic side effects of medication); *id*. at 143–51 (Page ID #512–20) (describing potential neuromuscular side effects); R. 70-1 (*Sell* App. at 4–7) (Page ID #229–32) (describing antipsychotic medication's side effects).

Both Dr. Graddy and Dr. Riley testified that therapy alone would not improve Sherrill's mental illness and competency, although therapy could be a helpful adjuvant to medication. Dr. Riley focused on illness management and recovery programs, which are an evidence-based form of therapy for persons with severe mental illnesses. R. 121 (*Sell* Hr'g Tr. at 48) (Page ID #417). Dr. Riley testified that she had offered to place Sherrill in an illness management and recovery program, but he refused this intervention. *Id.* at 49–50 (Page ID #418–19). Further, she believed that an illness management and recovery program without medication would not be effective in Sherrill's case, because the program requires that participants have "some understanding that they have a mental illness and that they need treatment," and that they have adequate treatment of symptoms to participate actively in treatment. *Id.* at 50 (Page ID #419). Dr. Graddy also concluded that "alternative, less intrusive treatments are unlikely to achieve substantially the same results as involuntary medication." R. 70 (Graddy Forensic Addendum & Treatment Plan at 4) (Page ID #224).

After the district court conducted its *Sell* hearing, it granted the government's Motion for Involuntary Medication. *United States v. Sherrill*, 439 F. Supp. 3d 1007, 1019 (M.D. Tenn. 2020). Sherrill timely appeals this order. R. 135 (Notice of Appeal) (Page ID #720–21); R. 136 (Corrected Notice of Appeal) (Page ID #722–23). The district court entered a stay of its order pending our resolution of his appeal. R. 134 (Order) (Page ID #718–19). We have jurisdiction over Sherrill's

appeal under the collateral-order doctrine. *Sell*, 539 U.S. at 176 (citing *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)).

## II. ANALYSIS

In *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court approved the involuntary medication of pretrial detainees to restore competency in limited circumstances. The Supreme Court listed four factors that the district court must find in order to grant an order to permit involuntary medication: (1) "*important* governmental interests are at stake"; (2) "involuntary medication will *significantly further* those concomitant state interests"; (3) "involuntary medication is *necessary* to further those interests"; and (4) "administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." *Id.* at 180–81. This framework recognizes that "[a]n individual has a constitutionally protected liberty interest in avoiding the unwanted administration of medication, and the Government may not deprive him of this liberty without an essential or overriding interest in doing so." *United States v. Mikulich*, 732 F.3d 692, 696 (6th Cir. 2013).

We approach this issue of involuntary medication with consciousness of defendants' "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221 (1990). "The drastic step of administering these powerful drugs to an unwilling criminal defendant should be taken rarely, and only when absolutely necessary to fulfill an important governmental interest . . . ." *United States v. Berry*, 911 F.3d 354, 357 (6th Cir. 2018).

On appeal, we review de novo the district court's determination that important governmental interests are at stake. *Id*. at 360. The remaining three factors involve factual

8

findings, so we review the district court's determination under the clear-error standard. *United States v. Green*, 532 F.3d 538, 552 (6th Cir. 2008).

WE AFFIRM the district court's order because it did not err in concluding that the government has adequately proven all four *Sell* factors.

## A. Important Governmental Interest

The district court did not err in concluding that the government had an important governmental interest in prosecuting Sherrill because any special circumstances present in Sherrill's case do not outweigh the length of his potential sentences. We first consider the seriousness of the crime, and then turn to whether any special circumstances mitigate its seriousness. *Berry*, 911 F.3d at 361.

### 1. Seriousness of the Charged Crime

When determining whether a crime involves sufficiently important government interests, we "look[] to the maximum penalty authorized by statute." *Mikulich*, 732 F.3d at 696. Our emphasis on the maximum possible penalty reflects that it is the "most objective means of determining the seriousness of a crime." *Green*, 532 F.3d at 549.

Sherrill potentially faces substantial mandatory sentences: conspiracy to distribute Oxycodone and methamphetamine, 21 U.S.C. § 846, carries a maximum potential sentence of life imprisonment and a mandatory minimum sentence of ten years' imprisonment; distribution of Oxycodone, 21 U.S.C. § 841(a)(1), carries a maximum penalty of twenty years' imprisonment; and distribution of 5 grams or more of methamphetamine, 21 U.S.C. § 841(a)(1), carries a maximum penalty of forty years' imprisonment and a mandatory minimum sentence of five years' imprisonment. "[W]e have not set a numeric threshold at which a crime may be deemed

'serious' . . . ." *Mikulich*, 732 F.3d at 697. In *Mikulich* and *Green*, however, we held that a maximum potential sentence of life imprisonment was sufficiently serious. *Id.*; *Green*, 532 F.3d at 549 (noting that the maximum penalty of life imprisonment and mandatory-minimum sentence of ten years' imprisonment "represent a decision by the legislature that possession of crack cocaine with the intent to distribute is a 'serious' crime warranting a serious punishment"); *cf. Berry*, 911 F.3d at 362 (declining to determine whether a five-year maximum sentence is per se serious enough to warrant involuntary medication). Sherrill's potential lengthy sentences, coupled with the potential mandatory-minimum sentences, support the district court's conclusion that his offenses are sufficiently serious.

## 2. Mitigating Circumstances

In addition to the seriousness of the crime, we must consider "[s]pecial circumstances" in a defendant's case that may undercut the government's interest. *Sell*, 539 U.S. at 180. "No single [mitigating] factor necessarily controls this analysis." *Mikulich*, 732 F.3d at 697. The defendant bears the burden of proving that special circumstances exist. *Id.* at 699 ("[W]e look to the defendant to demonstrate that the special circumstances of his case undermine the Government's interest once it is established that he stands accused of a serious crime.").

Sherrill cites four special circumstances that weigh against finding an important governmental interest: his offenses are non-violent, he is not a threat to himself or others, he was not arrested until after the government engaged in multiple controlled buys, and he is likely to be civilly committed if not prosecuted. Def.'s Br. at 29–34. We agree with the district court that these special circumstances do not undercut the government's important interest in prosecuting him.

First, he argues that his crimes are non-violent drug offenses, and that their non-violent character undermines the government's interest. *Id.* at 30. The district court concluded that possession of Oxycodone and methamphetamine with intent to distribute is a serious crime. *Sherrill*, 439 F. Supp. 3d at 1014. In support, the district court cited *Green*, 532 F.3d at 548–49, in which we held that the distribution of crack cocaine was a serious crime for the purpose of *Sell*. *Sherrill*, 439 F. Supp. 3d at 1014. In fact, as we mentioned in *Green*, the Supreme Court in *Sell* listed fraud as an example of a serious offense. *Green*, 532 F.3d at 548 (citing *Sell*, 539 U.S. at 180). *But see Berry*, 911 F.3d at 364 (noting that defendant's making a false report of explosives and planting a fake bomb outside a bank were non-violent crimes militating against an important government interest for the purposes of *Sell*).

Second, Sherrill notes that none of the experts concluded that he was a threat to himself or others. Def.'s Br. at 31. In *Berry*, we emphasized that the "uncontested evidence that in his current setting he poses no appreciable risk to himself or others undercuts the governmental interest necessary to medicate him." 911 F.3d at 365. Although this factor weighs in Sherrill's favor, it does not on its own overcome the seriousness of his offense. *See id.* at 366 (observing that "[n]o factor on its own outweighs the governmental interest").

Third, Sherrill advances a novel theory that his charges are not serious because the government engaged in multiple controlled buys over three months before it arrested him. Def.'s Br. at 31–33. Sherrill also notes that the lengthy potential sentences for his case stem from the government's decision to arrest him only after he had participated in multiple controlled buys. *Id.* at 32. To begin, Sherrill's argument fails because we have already considered drug-distribution offenses to be serious crimes. *Green*, 532 F.3d at 548–49. Moreover, his argument approaches

the theory of sentencing entrapment, which we have not adopted. *See United States v. Hammadi*, 737 F.3d 1043, 1048 (6th Cir. 2013) (collecting cases); *see also* R. 121 (*Sell* Hr'g Tr. at 194–95) (Page ID #563–64) (noting that Sherrill raises a "sentencing/entrapment-type" argument as a special circumstance). Sherrill's argument lacks support. In *Green*, we concluded that the defendant's charges for drug distribution were serious even when the defendant sold the illegal drugs to a confidential informant. 532 F.3d at 549.

Fourth, Sherrill argues that the government does not have an important interest in forcibly medicating him because he is likely to be civilly confined if not prosecuted. In *Sell*, the Supreme Court listed the likelihood of civil commitment as a special circumstance because "that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." 539 U.S. at 180. In addition, in *United States v. Grigsby*, 712 F.3d 964, 970–71, 976 (6th Cir. 2013), we reversed a district court's involuntary medication order because—among other things—the defendant provided extensive evidence that he would likely be civilly confined if not made competent for trial and the district court did not adequately consider whether civil commitment was appropriate.

Sherrill points to Dr. Riley's conclusion that Sherrill has drug-induced psychosis and that "in the community, it is quite likely that he would continue to use substances, as he has stated through many clinical interviews." R. 121 (*Sell* Hr'g Tr. at 43) (Page ID #412). The present case differs from *Grigsby*, however, because no expert has stated that Sherrill would be a candidate for civil commitment. The only reference to civil commitment at Sherrill's *Sell* hearing is when defense counsel asked Dr. Graddy if Sherrill would be a candidate for civil commitment. *Id.* at 173–75) (Page ID #542–44.) Dr. Graddy responded that he was unable to give an opinion on civil

commitment. *Id.* at 173 (Page ID #542). Although "a defendant is not required to manifest an absolute certainty of future civil confinement in order to undermine the Government[']s interest in prosecution," "'the government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain.'" *Mikulich*, 732 F.3d at 699 (quoting *United States v. Gutierrez*, 704 F.3d 442, 450 (5th Cir. 2013)). In the present case, the district court correctly concluded that "Sherrill's likelihood for [civil] commitment is far too speculative to diminish the government's interest in prosecution." *Sherrill*, 439 F. Supp. 3d at 1015.

Any mitigating special circumstances present in Sherrill's case do not outweigh the seriousness of his offenses. Therefore, the government has an important interest in prosecuting Sherrill.

## B. Medication Will Significantly Further the Government's Interest

The district court did not clearly err in determining that antipsychotic medication would significantly further the government's interest. In analyzing this factor, we "require[] proof both that administration of the medication is substantially likely to render the defendant competent to stand trial and is substantially unlikely to cause side effects that will interfere significantly with the defendant's ability to assist counsel in conducting the trial defense." *Grigsby*, 712 F.3d at 969.

The government has provided adequate evidence that administration of antipsychotic medication is substantially likely to make Sherrill competent to stand trial. In his report, Dr. Graddy stated that in his "opinion, with reasonable medical certainty, involuntary medications are substantially likely to render Mr. Sherrill competent to stand trial." R. 70 (Graddy Forensic Addendum & Treatment Plan at 4) (Page ID #224). He repeated this conclusion at Sherrill's *Sell* hearing. R. 121 (*Sell* Hr'g Tr. at 123) (Page ID #492).

Sherrill does not challenge the government experts' conclusions. Dr. Montgomery, the defendant's expert psychiatrist, stated in his report that medication "will likely enable Mr. Sherrill to be restored to competency to stand trial." R. 96-1 (Montgomery Forensic Eval. at 1) (Page ID #312). In response to the government's questioning at Sherrill's *Sell* hearing, Dr. McRainey admitted that that she did not disagree with Dr. Montgomery's conclusion. R. 121 (*Sell* Hr'g Tr. at 19) (Page ID #388). Medication may reduce the "intensity and fixation" of Sherrill's delusions and "allow the defendant to allow himself to focus on other issues without being consumed by his delusional beliefs." *Id.* Even Sherrill acknowledges that medication is likely to return him to competency. Def.'s Br. at 34.

We next consider whether the side effects may impair Sherrill's ability to participate in his defense. Dr. Graddy testified to the side effects of potential medications and addressed them in his *Sell* Appendix. The side effects of the potential antipsychotic medications, although not trivial, are unlikely to impair his ability to participate in his defense. R. 121 (*Sell* Hr'g Tr. at 124) (Page ID #493).

Sherrill does not challenge the impact of the antipsychotic medications *on his competency to stand trial*, but instead focuses on their impact *on his general health*. Def.'s Br. at 35. He criticizes Dr. Graddy's testimony as "not credible" because Dr. Graddy "was able to give a medical opinion on the un-likelihood of potential future medical side effects for Appellant, but could not give an opinion on future medical civil commitment possibilities." *Id.* at 36 (citing R. 121 (*Sell* Hr'g Tr. at 173, 192) (Page ID #542, 561)).

The district court did not clearly err in concluding that the government had proven that antipsychotic medication would significantly further Sherrill's ability to participate in his defense.

14

Dr. Graddy stated that the antipsychotic medication that he was considering for Sherrill would not significantly impair his ability to participate in his defense, but rather would "substantially likely" render him competent to stand trial. R. 70 (Graddy Forensic Addendum & Treatment Plan at 4) (Page ID #224). Sherrill's experts did not provide any evidence to the contrary.[2] Further, the district court included restrictions in its order to guard against the risk of potential side effects. *Sherrill*, 439 F. Supp. 3d at 1019. The safeguards detailed in the order include requiring that the psychiatrist prescribe the lowest effective dose, submit a report to the district court describing the first administration of the medication and any side effects Sherrill might experience, and provide the court with more detailed reports 60 and 120 days after Sherrill receives a copy of the order. R. 131 (Involuntary Medication Order at 2, 6) (Page ID #709, 713).

## C. Involuntary Medication Is Necessary to Further the Government's Interest

In the present case, neither the government's experts nor Sherrill's experts indicated that non-pharmaceutical therapies are an adequate replacement for medication. Dr. McRainey, Sherrill's expert psychologist, testified that medication is necessary to treat Sherrill's mental health conditions and restore his competency, although she believed that it would be more effective if Sherrill agreed to take the medication. R. 121 (*Sell* Hr'g Tr. at 10–11) (Page ID #379–80). Dr. Riley, the government's expert psychologist, discussed a potential non-pharmaceutical treatment, an illness management and recovery program, but concluded that the program would be ineffective

---

[2]In *Grigsby*, the defendant raised concerns that antipsychotic medication would impact his ability to assist in his own defense because neuromuscular side effects would "impair his ability to maintain a dignified appearance before the jury and would make it difficult for him to assist his counsel or testify in his own behalf." 712 F.3d at 975. We concluded that the government had failed to show that the antipsychotic medications are substantially unlikely to interfere with Grigsby's ability to participate in his defense. *Id.* Neither Sherrill nor his experts have raised this issue here.

without the assistance of antipsychotic medication. *Id.* at 87–89 (Page ID #456–58). Moreover, Sherrill has refused to participate in the illness management and recovery program or other therapy. *Id.* at 49–50 (Page ID #418–19).

The expert testimony and reports in Sherrill's case all support the district court's conclusion that medication is necessary to restore Sherrill to competency. Therefore, we conclude that the district court did not clearly err in finding medication was necessary to restore Sherrill to competency.

## D. Involuntary Medication is Medically Indicated

The fourth *Sell* factor requires that the district court "conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181. For this factor, "[t]he specific kinds of drugs at issue may matter," because "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id.*

The district court did not clearly err when it concluded that antipsychotic medication was medically indicated for Sherrill's mental health conditions. *Sherrill*, 439 F. Supp. 3d at 1018. Dr. Graddy testified that antipsychotic medication is "the only medically appropriate treatment" for Sherrill's mental health conditions. R. 121 (*Sell* Hr'g Tr. at 184) (Page ID #553). The district court emphasized that Dr. Graddy submitted an individualized treatment plan for Sherrill, which included beginning any medication with short-lasting, low doses to ensure that it is tolerated and explaining to Sherrill the risks and benefits of different medications and seeking his input. As a result, the district court concluded that antipsychotic medication was medically appropriate for

Sherrill. *Sherrill*, 439 F. Supp. 3d at 1018 (citing R. 70 (Graddy Psychiatric Evaluation 4–5) (Page ID #224–25)).

Because no expert has disagreed that medication is medically appropriate for Sherrill, we will not disturb the district court's finding.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order to medicate Sherrill involuntarily.