RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0275p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DUANE LETROY BERRY,

*Defendant-Appellant.*

No. 17-2168

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cr-20743-1—David M. Lawson, District Judge.

Argued: October 30, 2018

Decided and Filed: December 19, 2018

Before: MERRITT, CLAY, and BUSH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Craig A. Daly, CRAIG A. DALY, P.C., Detroit, Michigan, for Appellant. Kevin M. Mulcahy, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Craig A. Daly, CRAIG A. DALY, P.C., Detroit, Michigan, for Appellant. Kevin M. Mulcahy, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

JOHN K. BUSH, Circuit Judge. When the government seeks to involuntarily medicate a mentally incompetent defendant to restore his competency for trial, the government's prosecutorial interest must be balanced against the defendant's "significant . . . liberty interest [under the Constitution] in avoiding the unwanted administration of antipsychotic drugs." *Sell v.*

*United States*, 539 U.S. 166, 178 (2003) (internal quotation marks omitted) (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)). Aside from the potentially dangerous (and sometimes fatal) side effects of antipsychotic drugs, their very nature is to alter the cognitive processes of the patient. The drastic step of administering these powerful drugs to an unwilling criminal defendant should be taken rarely, and only when absolutely necessary to fulfill an important governmental interest, to avoid deprivation of the defendant's "liberty . . . without due process of law." U.S. Const. amends. V, XIV § 1.

Defendant Duane Berry is charged with Conveying False Information Regarding Explosives, in violation of 18 U.S.C. § 1038(a), which carries a maximum sentence of five years' imprisonment. He allegedly placed a briefcase made to look like a bomb, but containing only papers and no explosives, outside a bank. Berry is not competent to stand trial absent medication—and even that is not guaranteed—but he does not wish to be medicated. The district court ordered him to be treated with antipsychotic drugs.

As discussed below, even assuming the five-year statutory maximum sentence for the charged crime makes it a serious offense that could qualify for Berry to be forcibly medicated, there are significant mitigating factors that weigh against finding that the government has a sufficient interest for such mandated treatment. Most importantly, Berry has already been confined for the length of time he likely would face as imprisonment if convicted, and his pretrial confinement would likely be credited against his jail term. In these circumstances we find that the government has not shown that its interest in prosecuting Berry outweighs his due process liberty interest. Accordingly, we **REVERSE** the decision of the district court and **VACATE** its order compelling Berry to be involuntarily medicated.

I.

Berry's prosecution arises from a briefcase that the government alleges he placed outside of a Bank of America branch office in Detroit, Michigan, on November 6, 2015. This was no ordinary briefcase. According to the government, it was made to look like a bomb, though it actually contained no explosive device. Instead, all that was inside were various documents, some bearing Berry's name and signature, evidencing a dispute between Berry and the bank.

Berry suffers from mental illness. He apparently believes that he is the trustee of a trust which owns all of Bank of America's assets, and that it is his duty to execute the trust and repossess those assets. According to the government, the briefcase incident was not Berry's first encounter with the bank. The week before the briefcase appeared, a wave of vandalism swept across multiple Bank of America locations throughout Detroit, and the government believes that Berry was responsible, based on a statement given by one of his relatives. For his part, Berry is convinced that, in addition to his status as a trustee of Bank of America's assets, he is a government agent and thus is immune from federal prosecution for any acts the government claims he has committed.

After Berry's arrest and arraignment, the district court ordered his evaluation for competency to stand trial. Berry was first evaluated by Dr. Christine Scronce, a Bureau of Prisons forensic psychologist. She diagnosed Berry with a delusional disorder and opined that without treatment, including medication, he is unlikely to be competent to stand trial. After conducting a hearing on the issue, the district court agreed with Dr. Scronce's findings.

On August 30, 2016, the district court ordered Berry into the custody of the Attorney General for treatment to regain competency. The initial order was for a period of treatment and evaluation to last no longer than four months, although it was later extended to five months. This order did not require Berry to be medicated.

Berry was sent to the Federal Medical Center in Butner, North Carolina. Treatment there was unsuccessful. He would not participate in group therapy and refused staff requests to answer even basic informational questions. Berry met with his principal psychologist, Dr. Kristina Lloyd, only five times, and he cut short each interview after only a few minutes. Berry served a purported lawsuit upon Dr. Lloyd and claimed to have filed professional complaints against her and the other doctors at the facility. Most importantly, Berry refused to take medication.

Given the inefficacy of other methods of treatment, Dr. Lloyd recommended that the district court consider involuntary medication. Although antipsychotic medications are not guaranteed to "cure" Berry or even mitigate his symptoms, approximately 70–80% of patients receive positive benefits from this type of treatment. Furthermore, the doctors who attempted to

treat Berry do not believe that he has a realistic hope of regaining competency without some sort of medication regimen. The possible side effects, however, are not insignificant. They potentially include "weight gain, muscle stiffness, restlessness, sedation . . . suicide, diabetes, high cholesterol, neuroleptic malignant syndrome, dystonic reaction, Parkinson's syndrome-like symptoms and sudden death." Appellant Br. at 11. Nonetheless, Berry's doctors do not believe that there are any less intrusive alternatives to medication which might effectively treat his mental illness.

The district court conducted two hearings to determine whether involuntary medication would comply with the *Sell* requirements to order such treatment. These requirements are (1) "that *important* governmental interests are at stake," *Sell*, 539 U.S. at 180; (2) that "involuntary medication will *significantly further* those concomitant state interests," *id.* at 181; (3) that the proposed treatment is necessary to the furtherance of the government's interest, *id.*; and (4) that the administration of medication is medically appropriate, *id.*

At the first hearing the court determined that Berry's alleged crime was serious enough to show an important governmental interest in his prosecution. At the second hearing, the court determined that involuntary medication would significantly further the government's interests, that medication was necessary to further those interests, and that the proposed treatment was medically appropriate. Finding all of the *Sell* requirements satisfied, the court entered an order requiring Berry to undergo medication.

Berry's appeal was untimely. But the government, in light of the important issues presented by this appeal, has waived objection based on untimeliness. We therefore examine the district court order and determine the legality of forcing Berry to be medicated. *See United States v. Gaytan-Garza*, 652 F.3d 680, 681 (2011) (per curiam) (holding that the timing requirements of Federal Rule of Appellate Procedure 4(b) are "not jurisdictional" and that "we are not required to dismiss late-filed criminal appeals unless the government has raised the issue . . .").

II.

The government may not prosecute a mentally incompetent defendant. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). If, after a hearing, a district court finds by a preponderance of the evidence that the federal defendant suffers from "mental disease or defect" which renders the defendant incapable of understanding the charges or assisting in his own criminal defense, the court must commit the defendant to the custody of the Attorney General. 18 U.S.C. § 4241(d). The Attorney General must hospitalize the defendant in a suitable facility for a reasonable period of time up to four months "to determine whether there is a substantial probability that in the foreseeable future" the defendant will regain mental competency. *Id.* § 4241(d)–(d)(1). The Attorney General may then hold the defendant for an additional period, either to allow for competency to be restored if the court finds there is a substantial probability that this will happen, or until the pending charges are disposed of. *Id.* § 4241(d)(2). If the defendant does not regain competency, he may be released if he presents no threat of harm to others or property. *Id.* § 4246(a). But if he does pose such a threat, he should be civilly committed. *Id.*

A difficult question arises when a criminal defendant is mentally incompetent but refuses to take medication that might render him competent. The Supreme Court confronted the issue in *Sell*, which held that in certain circumstances a court may order a defendant to be medicated against his will. *See generally* 593 U.S. 166. However, as the Court noted, these circumstances "may be rare." *Id.* at 180. A defendant has "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs . . . ." *Washington v. Harper*, 494 U.S. 210, 221 (1990) (recognizing that convicted criminals possess this liberty interest); *accord Riggins v. Nevada*, 504 U.S. 127, 135 (1992) (extending the *Harper* logic to defendants as well as to convicts). This liberty interest arises not only because antipsychotic drugs are dangerous, powerful medications that carry the risk of serious side effects, *Harper*, 494 U.S. at 229, but also because the very purpose of these drugs is to "alter the will and the mind of the subject," *id.* at 238 (Stevens, J., concurring in part and dissenting in part). Because a criminal defendant has such a strong liberty interest in not having his mind and will altered, involuntary medication is generally disfavored. *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005).

Accordingly, if the government wishes to involuntarily medicate, it bears a significant burden: all four *Sell* factors must be established by clear and convincing evidence. *United States v. Green*, 532 F.3d 538, 548 (6th Cir. 2008). Here, our analysis need not go beyond the first factor—"that *important* governmental interests are at stake." *Sell*, 539 U.S. at 180. Because the district court's finding as to this factor is a legal determination, our review is de novo. *See Green*, 532 F.3d at 546.

In order for important governmental interests to be at stake, the defendant must be charged with a serious crime, whether against person or property, the prosecution of which is needed to protect society's "basic human need for security." *Sell*, 539 U.S. at 180. If such a crime is charged, then we must also examine "the facts of the individual case" to determine if "special circumstances . . . lessen the importance of [the government's] interest." *Id.*

A.     Seriousness of the Charged Crime

To begin, we examine the seriousness of Berry's alleged crime. The central part of this review is consideration of "the maximum penalty authorized by statute," *United States v. Mikulich*, 732 F.3d 692, 696 (6th Cir. 2013)—that is, we examine the maximum criminal penalty that may be imposed upon the defendant if he is convicted. This is an objective measurement which "respects the legislature's fundamental role in determining the seriousness of a particular [crime]" while also reducing "the potential for arbitrariness . . . ." *Id.* at 696–97. Here, the statutory maximum imprisonment is five years.

Is five years enough for a crime to be sufficiently serious to justify forced medication of a defendant? We have not previously defined what is the shortest or least severe sentence a defendant may face and still be considered to have committed a serious crime for purposes of mandated treatment with antipsychotic drugs. Certainly a penalty of capital punishment is serious: in *United States v. Payne* we affirmed the district court's decision to forcibly medicate a defendant who faced a capital charge. 539 F.3d 505 (6th Cir. 2008). Likewise, a potential penalty of life imprisonment is also serious enough to warrant forcible medication, as we noted in *Mikulich*, 732 F.3d at 697 and in *Green*, 532 F.3d at 549. And in *United States v. Grigsby*, we

found that the government had an important interest in prosecuting an accused bank robber who faced a twenty-year sentence.  712 F.3d 964 (6th Cir. 2013); *see* 18 U.S.C. § 2113(a).

In only one case, *United States v. Dellinger*, have we upheld a *Sell* order based on a five-year maximum sentence. 588 F. App'x 487 (6th Cir. 2013) (per curiam).  However, *Dellinger* was an unpublished memorandum opinion, and the defendant in that case conceded that the charged crime was serious; he only argued that mitigating factors meant the *Sell* requirements were not satisfied.  *United States v. Dellinger*, No. 13-cr-20808, 2014 WL 2587697, at *2–3 (E.D. Mich. June 10, 2004).  Therefore, the seriousness of a crime that carries a five-year statutory maximum sentence has never been decided by our court in a case where that issue was disputed by the parties.

Nor have most other circuits resolved whether a potential five-year sentence can make a crime sufficiently serious to justify forced medication of a criminal defendant.  In many circuits the relevant cases have involved a ten-year statutory maximum.  For example, in *United States v. Evans*, the Fourth Circuit found that "threatening to murder a federal judge under § 115(a)(1)(B), a felony whose maximum term of imprisonment is 10 years . . . is 'serious' under any reasonable standard."  404 F.3d 227, 238 (4th Cir. 2005) (citing *Baldwin v. New York*, 399 U.S. 66, 71 (1970)).  Likewise, the Eighth Circuit has held that ten years' potential imprisonment for the offense of failure to register as a sex offender under 18 U.S.C. § 2250(a) "is 'serious' under any reasonable standard."  *United States v. Mackey*, 717 F.3d 569, 573 (8th Cir. 2013) (quoting *Evans*, 404 F.3d at 238).  The Fifth Circuit has not clearly adopted the maximum-statutory-penalty approach, but it has acknowledged courts that have adopted this approach in upholding a district court's conclusion that a crime with a ten-year sentence was serious.  *United States v. Palmer*, 507 F.3d 300, 303 (5th Cir. 2007) (finding "serious" the crime of possession of a firearm and ammunition by a person that has been adjudicated as mentally defective).

One circuit that did find the requisite seriousness in a crime with a five-year statutory maximum sentence is the Ninth Circuit in *United States v. Onuoha*, 820 F.3d 1049 (9th Cir. 2016).  In *Onuoha* the defendant, Nna Alpha Onuoha, was a former TSA employee who had worked at Los Angeles International Airport ("LAX").  *Id.* at 1051–52.  After Onuoha was suspended from the TSA, he left a threatening letter and made threatening phone calls to his

former office inside LAX. *Id.* Although authorities quickly determined that Onuoha's threat was not credible, and the airport was not evacuated, the TSA office at LAX was evacuated. *Id.* Subsequently, Onuoha was charged with a violation of 18 U.S.C. § 1038(a)(1). *Id.* at 1051. Onuoha suffered from mental disease (schizophrenia) and was found incompetent to stand trial. *Id.* at 1053. The government sought a *Sell* order for involuntary medication, which the district court granted. On appeal, the Ninth Circuit considered, inter alia, whether Onuoha's alleged § 1038 violation was sufficiently serious to warrant involuntary medication. The Ninth Circuit ultimately concluded that Onuoha's alleged crime was in fact serious, notwithstanding a relatively short potential sentence for Onuoha. *Id.* at 1056.[1]

The government makes much of the fact that Onuoha was charged with the same crime as Berry, and that Berry's modus operandi mirrored Onuoha's. The government in *Onuoha* successfully argued that the conduct at issue, which had stoked fears of terrorism in the population at large, reinforced the government's interest in prosecuting Onuoha. Similarly, here, the government argues that Berry "stoked terrorism concerns in a 'highly populated public venue.'" Appellee Br. at 15 (quoting *Onuoha*, 820 F.3d at 1056). However, while the factual similarities between the two cases may be striking, we are concerned with the legal differences between them.

Like this circuit's approach, the Ninth Circuit's analysis of the first *Sell* prong is a two-part test: the Ninth Circuit considers (1) whether the alleged crime was "sufficiently 'serious' to establish an important governmental interest[,]" and if so, (2) whether there were any mitigating factors that reduce the governmental interest. *Onuoha*, 820 F.3d at 1054. However, unlike this circuit, the Ninth Circuit does not use the statutory maximum sentence as a proxy for seriousness; instead, the Ninth Circuit relies on the defendant's putative Sentencing Guidelines range. *Id.* at 1055. Additionally, the Ninth Circuit considers the defendant's criminal history and the nature of the charged crime. *Id.* Thus, in *Onuoha* the Ninth Circuit considered at least three factors when it determined that the government had an important interest in prosecuting

---

[1]Although the Ninth Circuit found that the government had satisfied the seriousness prong of *Sell*, it nonetheless reversed the district court on the grounds that the government had not proved that involuntarily medicating Onuoha was medically appropriate. *Onuoha*, 820 F.3d at 1060.

Onuoha: the relatively short potential sentence, the defendant's prior criminal history, and the fears of terrorism which Onuoha's conduct aroused.

By contrast, we have not considered any of the factors deemed relevant by the Ninth Circuit in reviewing *Sell* determinations. Our circuit has specifically rejected an approach which considers the Sentencing Guidelines in favor of an approach which relies on statutory maximum sentences. *See Green*, 532 F.3d at 550 ("All of these considerations weigh against relying on the Sentencing Guidelines to determine whether a crime is 'serious' for purposes of a *Sell* order, and counsel in favor of using the statutory maximum prescribed by Congress."). Further, in our circuit (unlike the Ninth Circuit), considerations of the defendant's criminal history and the nature of the crime are inappropriate for purposes of analyzing "seriousness" for a *Sell* order. Given these differences between the two circuits' respective approaches, we cannot rely on *Onuoha*'s reasoning to compel Berry's medication.

We are therefore left to consider whether a five-year maximum sentence is serious enough to support the type of governmental interest that would allow a court to compel medication, and we do so without clear guidance from any applicable decision. In these circumstances, we are hesitant to establish a per se rule either that five years is enough, or not enough. Also, as discussed below, the unique circumstances of Berry's case render it unnecessary to decide this issue here. Even assuming that a crime with a five-year statutory maximum sentence could qualify as a serious crime for *Sell* purposes, the mitigating factors discussed below lessen the government's interest such that it is insufficient to warrant mandated medication here.

B.      Mitigating Circumstances

There are several mitigating circumstances that significantly undercut the governmental interest in prosecuting Berry. Most importantly, the length of Berry's pre-trial confinement counsels against involuntary medication. If we were to affirm the district court's medication order, even if Berry were to be convicted, by the date of his sentencing he would have already served a period in pre-trial custody approximating his expected sentence. Additionally, the non-violent nature of Berry's charged crime, the low risk that he will harm himself or others, and the

likelihood that he will be civilly committed all reduce the government's interest in prosecuting Berry.

### 1. Length of Pre-Trial Confinement

First, we must consider the length of Berry's pre-trial confinement. The Supreme Court in *Sell* specifically noted that a lengthy pre-trial confinement which would be credited against "any sentence ultimately imposed" undercuts the government's interest in prosecution. 539 U.S. at 180. This is because the Bureau of Prisons is required to give a convicted defendant credit for time spent in pre-trial confinement. See 18 U.S.C. § 3585(b)(1) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed . . . ."). Therefore, a lengthy pre-trial confinement (especially when coupled with a relatively short potential sentence) reduces or eliminates the amount of time a criminal defendant could potentially face. The government's interest in prosecuting a criminal defendant comes (at least in part) from the deterrent effect that such prosecution and the attendant prison sentence will bring. *See United States v. Gutierrez*, 704 F.3d 442, 451 (5th Cir. 2013) ("[P]rosecution of the instant offenses expresses society's disapproval of such conduct and potentially deters others from engaging in it."). Where a defendant has already served sufficient time that a guilty verdict will result only in a sentence of time served, the deterrent effect of imprisonment has evaporated, and the overall governmental interest in prosecution is weakened.

Although we use the statutory maximum sentence in determining whether the government has an important interest in prosecuting a defendant, we use the Guidelines sentencing range for our analysis of mitigating circumstances. *Grigsby*, 712 F.3d at 973–74. There is "no principled reason to ignore" the realities of an individual defendant's likely actual sentence when determining the extent of the "government's interest in prosecution." *Id.*

In the instant case, Berry has been confined awaiting trial since November 9, 2015. This puts his pre-trial confinement in the neighborhood of thirty-six months. The government seeks an order for four months of medication. This would take Berry to at least forty months of pre-trial confinement before his trial could even begin. According to Berry, his Guidelines range

(if he were to be convicted) would be twenty-seven to thirty-three months.  The government, by contrast, believes that Berry's potential Guidelines range is thirty to thirty-seven months.  Here, we need not determine which party's prediction of the Guidelines range is more accurate.  Even if we rely on the government's estimate, Berry will have already served nearly all of the time of his potential sentence before the trial even begins.  Even in a best-case scenario, one in which Berry is quickly restored to competency, and quickly tried and found guilty, by the time he is sentenced he will have served more time than his Guidelines range.  Any delays in his treatment or in the trial would only exacerbate this issue.  In short, it is highly unlikely that prosecuting Berry would result in any additional sentence actually being imposed on him.

The fact that Berry will likely not receive additional time significantly undercuts the government's interest in prosecuting him.  Berry's ultimate sentence would not provide any deterrent effect, and any governmental goal in keeping Berry confined (to prevent recurrences of his alleged behavior) will also be frustrated.  However, *Sell* directs us that while lengthy pre-trial confinement moderates the governmental interest, it does not "eliminate . . . the importance of the governmental interest in prosecution."  539 U.S. at 186.  Therefore, we will examine the additional factors which also undercut the governmental interest in prosecuting Berry.

### 2.  Additional Mitigating Factors

Aside from Berry's lengthy pre-trial confinement, we identify three other factors that mitigate the government's interest: 1) the non-violent nature of the charged crime; 2) the fact that Berry does not present a risk of harm to himself or others; and 3) the likelihood that Berry will be civilly committed in lieu of incarceration.

### a.  Non-Violent Nature of the Charged Crime

First, we consider the fact that Berry's briefcase was, in fact, just a briefcase and not a bomb.  In *Mikulich*, we noted that crimes which "relate to violent behavior . . . carry a unique governmental interest."  732 F.3d at 697.  In *Mikulich,* the defendant was charged with leaving a bomb outside of a federal building—an actual bomb, which we found to be unquestionably violent, and which consequently heightened the government's interest in prosecuting him.  *Id. Mikulich* is not this case.

Berry's alleged crime is a violation of 18 U.S.C. § 1038(a)(1)(A). Section 1038(a) makes it a crime to "convey false or misleading information" regarding an explosive device: the statutory provision outlaws making false bomb threats, among other things. Notably, § 1038 carries three different penalties depending on the result of the bomb threat. If death results, a defendant faces up to life imprisonment. *Id.* § 1038(a)(1)(C). If serious bodily injury results, a defendant faces up to twenty years' imprisonment. *Id.* § 1038(a)(1)(B). But where, as in Berry's case, the bomb threat is not aggravated by death or serious injury, the defendant faces five years' imprisonment. *Id.* § 1038(a)(1)(A).

To reiterate, Berry's briefcase, although allegedly made to look like a bomb, was not actually a bomb, and it contained only papers, not any explosive. Although it may be alleged that Berry intended to cause fear, it cannot be said that the crime was violent as alleged in the indictment. Neither death nor serious bodily injury resulted from Berry's alleged actions. In fact, there was no physical injury at all. Hence, Berry was charged under § 1038(a)(1)(A) rather than the harsher provisions, § 1038(a)(1)(B) and (C).

This is not to say that a crime needs to be violent to implicate important governmental interests. For example, in *Green*, we noted that possession of crack cocaine with intent to distribute is "a serious crime warranting a serious punishment." 532 F.3d at 550. However, where a crime is one of violence, the government has a duty "to protect through application of the criminal law the basic human need for security." *Sell*, 539 U.S. at 180. This "basic human need for security" is relatively less implicated if the crime is not a crime of violence. The non-violent nature of Berry's alleged crime, therefore, militates against there being an important government interest under the *Sell* framework.

b. Risk of Harm to Himself and Others

We also consider the risk that Berry will harm himself or others if he is not medicated. There are two separate modes of analysis for involuntary medication: *Sell* analysis, for incompetent defendants (under which we analyze Berry); and *Harper* analysis, for convicted prisoners who pose a risk of harm to themselves or others. *Harper*, 494 U.S. 210. Under the *Harper* inquiry, the government may forcibly medicate an inmate "if the inmate is dangerous to

himself or others and the treatment is in the inmate's medical interest." *Id.* at 227. Courts must "remain mindful of the . . . distinction between the purposes and requirements" of the two tests and "take care to separate the *Sell* inquiry from the *Harper* dangerousness inquiry and not allow the inquiries to collapse into each other." *Onuhoa*, 820 F.3d at 1056 (quoting *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008)). Thus, under *Sell*, when analyzing governmental interest in prosecuting a defendant, consideration of the defendant's potential self-harm would be inappropriate. However, the second step of the first *Sell* prong, in which courts examine the mitigating factors of the particular defendant, is an appropriate time to consider a defendant's *lack* of dangerousness.

The government acknowledges that Berry does not pose a risk to himself or others. Berry's doctors in the federal medical facility have stated that "there is no convincing evidence Mr. Berry poses a substantial risk of dangerousness in the current conditions of his confinement." Appellee Br. at 16. We cannot be certain that Berry will not become dangerous if and when he is ultimately released, but the uncontested evidence that in his current setting he poses no appreciable risk to himself or others undercuts the governmental interest necessary to medicate him.

c. Likelihood of Civil Commitment

A closely related issue to dangerousness is the likelihood of civil commitment, which is governed by 18 U.S.C. § 4246. If a federal convict has served his sentence, or if a federal defendant has had his charges dropped because of mental incompetence, the government may seek that individual's continued detention in a federal medical facility. If the district court determines "by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another," the court shall continue the individual in the custody of the Attorney General. 18 U.S.C. § 4246(d). Under *Sell*, we must analyze whether Berry will be civilly committed, because "lengthy confinement in an institution for the mentally ill . . . diminish[es] the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell*, 539 U.S. at 180.

The government argues that Berry's lack of dangerousness within the confines of the federal medical center make it uncertain whether a court will find that Berry's release "would create a substantial risk of bodily injury to another person or serious damage to property of another." Appellee Br. at 16 (quoting 18 U.S.C. § 4246(d)). It is true that "the government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain." *Mikulich*, 732 F.3d at 699 (quoting *Gutierrez*, 704 F.3d at 450). However, while the mere uncertain possibility of civil commitment is not enough, neither is there a requirement that the defendant must prove that civil commitment is a certainty. *Grigsby*, 712 F.3d at 972. ("The Supreme Court could have required a certainty of future civil confinement. It did not; so we should not.").

We cannot state with certainty that Berry will be civilly committed. However, his likelihood for commitment is far beyond mere possibility. Section 4246(d) allows commitment when a prisoner presents "a substantial risk of bodily injury to another person or serious damage to *property of another* . . . ." 18 U.S.C. § 4246(d) (emphasis added). As we have noted, in the week leading up to Berry's arrest, numerous Bank of America locations throughout Detroit were targeted for vandalism. One of Berry's relatives apparently blamed the vandalism on Berry, which would seem to fit with Berry's vendetta against Bank of America. Although Berry is not a danger to other individuals under current conditions, we believe that there is a strong likelihood, given Berry's predilections regarding Bank of America, that a court will find that Berry's release, in an untreated state, would "create a substantial risk of . . . serious damage to property of another . . . ." *Id.* The probability that Berry will be civilly committed significantly undercuts the governmental interest in prosecuting him; even without prosecution, Berry will likely remain in government custody for the foreseeable future.

III.

Ultimately, Berry's unique circumstances provide enough mitigation such that the government does not have sufficient interest in prosecuting him to warrant forcible, involuntary medication. No factor on its own outweighs the governmental interest, but the combination of all the factors makes involuntary medication inappropriate in this case. Even assuming the five-year maximum sentence of Berry's charged crime could support a significant government

interest warranting involuntary medication, the mitigating circumstances lessen this interest below the level to justify mandated treatment.

In light of both the relatively short sentence Berry faces and his mitigating factors, the governmental interest is too weak to justify forcible medication. Because the government failed to establish the first *Sell* prong by clear and convincing evidence, we need not investigate the district court's factual findings on the remaining *Sell* factors.

For the foregoing reasons, we **REVERSE** the decision of the district court and **VACATE** the order compelling Berry to undergo forced medication.