COURT OF APPEALS
DECISION
DATED AND FILED

May 27, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2026AP484-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2025CF814

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

P. M. V.,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Brown County: SAMANTHA WAGNER, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Pamela[1] appeals from a circuit court order authorizing her to be involuntarily administered medication for the purpose of restoring her to competency so that she may stand trial in a criminal case. *See* WIS. STAT. § 971.14. On appeal, Pamela argues that the State failed to establish all of the constitutional factors under *Sell v. United States*, 539 U.S. 166, 180-82 (2003), and the statutory factors under § 971.14(3)(dm). For the reasons we explain below, we affirm the circuit court's involuntary medication order.

## BACKGROUND

¶2 The State charged Pamela with one count of false imprisonment, a Class H felony, and one count of obstructing an officer, a Class A misdemeanor. Pamela had previously been diagnosed with schizophrenia, and these charges stemmed from a welfare check that was conducted on May 21, 2025, at Pamela's home by Nora, a mental health clinician, due to Pamela's "decompensated mental health and being off all psychotropic medications." According to the criminal complaint, Nora entered Pamela's home alone, while law enforcement parked a short distance away "in case [Nora] later needed assistance." At some point, Nora requested assistance by text message, and law enforcement entered Pamela's home. Inside, officers found Nora seated in a chair in the living room, "visibly shaking and holding a tissue as if she had just been crying."

---

[1] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than her initials. *See* WIS. STAT. RULE 809.109(6) (2023-24). We also use a pseudonym when referring to the victim, pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24). We use the same pseudonyms utilized by the appellant in her briefing before this court.

All references to the Wisconsin Statutes are to the 2023-24 version.

¶3    Nora reported that when she entered Pamela's home, Pamela instructed her to sit in a chair, and Pamela then accused Nora of "stealing her soul" and said, "I will be smashing the souls out of you."  Pamela also called Nora "Mary Lou Retton"; she identified herself as "God" and as the biblical figures "Joeb" and Timothy; she told Nora "that [she] didn't need to be afraid, the process [of removing the souls] would be painful, would take until the end of the day, but once it is finished, [Nora] would be saved"; Pamela told Nora that her "family would be able to gain entrance to heaven after the souls were removed from [Nora's] body"; and she told Nora to "ask for forgiveness and say goodbye to [her] family."  When Nora attempted to "excuse [herself] with the intention of calling for help," Pamela said she "must remain seated" and refused to allow her "to leave [Pamela's] presence."  Nora was able to "send a few text messages before [Pamela] noticed" and "demanded that [Nora] put [her] phone down."

¶4    When law enforcement arrived to assist Nora, Pamela ordered the officer to leave, but she still refused to allow Nora to leave.  Pamela made several remarks to the officer suggesting that she was suffering from delusions, including that "her words were coming from 'God,'" at which time another officer arrived, and they attempted to place Pamela under arrest based on Nora's statement that "she had criteria for an 'EM1' detention."  Pamela allegedly resisted arrest by pulling her arms away from the officers and by wrapping her legs and feet around a stair rail.  With the help of additional officers, Pamela was eventually disengaged from the stair rail, and she was secured in a full-body restraint.

¶5      Pamela was admitted for emergency detention at Winnebago Mental Health Institute (WMHI).[2]  At her initial appearance, defense counsel raised the issue of competency.[3]  After a competency evaluation was filed, the circuit court committed Pamela for competency restoration under WIS. STAT. § 971.14.

¶6      Several months later, and following a mental decline, Dr. Kevin Hansen, a psychiatrist at WMHI, requested an order allowing for the involuntary administration of medication to restore Pamela to competency.  *See* WIS. STAT. § 971.14(5)(a).  A treatment plan, authored by Hansen, was attached to the motion.

¶7      The circuit court held an evidentiary hearing on the motion.  Pamela did not appear for the hearing, and the court waived her appearance.  Hansen testified regarding his assessments of Pamela, stating that she had decompensated significantly "related to her delusions, paranoia, thought content, and her ability to take care of herself."  Hansen recommended that Pamela restart the medications that she was prescribed under her civil commitment, which she "had a relatively good response to."[4]  He opined that those medications would "substantially improv[e]" the likelihood of restoring Pamela to competency based on her past experience with those medications.  Hansen also explained that he attempted to

---

[2] According to the record, Brown County initially dismissed Pamela's emergency detention, "citing a 'lack of dangerousness.'"  Pamela was then discharged against medical advice.  Several days later, Pamela returned to WMHI under another emergency detention.

[3] At the initial appearance, Nora also informed the circuit court that she did not want Pamela in jail, and she concluded that Pamela "needs help."

[4] Pamela was subject to an unrelated civil commitment that overlapped in part with her commitment under WIS. STAT. § 971.14.  Under that civil commitment, she was involuntarily medicated and, according to Hansen, exhibited "notable improvement in functioning."  Hansen recounted that, when the civil commitment ended in early December 2025, Pamela refused to take medication, which led to her decompensation.

discuss the advantages, disadvantages, and alternatives to the medications with Pamela, but she responded with "nonsensical, delusional and paranoid statements." Hansen therefore concluded that Pamela was unable to express an understanding and was also substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to medication to make an informed choice about whether to accept or refuse medication or treatment. *See* WIS. STAT. § 971.14(3)(dm). Hansen's treatment plan was received into evidence without objection.

¶8 On cross-examination, Hansen could not "articulate" exactly how long it would take to restore Pamela to competency and opined that it would likely take weeks or months. Hansen explained that Pamela "has demonstrated treatment resistance schizophrenia"; she "had a relatively good response to" the previous medications; but he could not guarantee the same results this time because decompensation results in a "deterioration of the brain that we can't always get back."

¶9 After hearing arguments from the parties, the circuit court granted the motion for involuntary medication. Based on its review of Hansen's treatment plan, the court found that Pamela had been diagnosed with schizophrenia, that she was refusing to take medication following the end of her civil commitment, and that the proposed medications had previously helped her. The court then found that Pamela had been charged with a serious crime and that the State had met the remaining *Sell* factors. The court concluded that the proposed medications were substantially likely to render Pamela competent based on "direct evidence" of their

5

effectiveness on Pamela in the past. The court entered an Order for Commitment for Treatment on January 9, 2026. Pamela appeals.[5]

## DISCUSSION

¶10 In *Sell*, the United States Supreme Court concluded that "a state may, within certain limits, forcibly 'administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial.'" *State v. J.D.B.*, 2026 WI 5, ¶1, 419 Wis. 2d 383, 31 N.W.3d 314 (quoting *Sell*, 539 U.S. at 179). Our supreme court has likewise determined that "circuit courts may order involuntary medication to restore trial competency under [WIS. STAT.] § 971.14 only when the order complies with the *Sell* standard." *State v. Fitzgerald*, 2019 WI 69, ¶2, 387 Wis. 2d 384, 929 N.W.2d 165. Under that constitutional standard, the State must "prove the factual components of each of the" following four *Sell* factors "by clear and convincing evidence": "(1) the State has an important interest in proceeding to trial; (2) involuntary medication will significantly further that State interest; (3) involuntary medication is necessary to further that State interest; and (4) involuntary medication is medically appropriate." *State v. D.E.C.*, 2025 WI App 9, ¶32, 415 Wis. 2d 161, 17 N.W.3d 67 (2024) (citation omitted).

¶11 Statutorily, WIS. STAT. § 971.14(3)(dm) also requires the State to "make a double showing." *J.D.B.*, 419 Wis. 2d 383, ¶51. First, the State "must prove that the advantages and disadvantages of the medication were explained" to

---

[5] Pursuant to statute, the involuntary medication order was automatically stayed for 14 days. *See* WIS. STAT. RULE 809.109(7)(a). Pamela filed a motion to continue the stay, which this court denied by order dated February 19, 2026.

the defendant. *Id.* Second, the State "must demonstrate that [the defendant] lacks ability either to apply or to express his [or her] understanding of the advantages and disadvantages of the medication." *Id.*

¶12    In this appeal, Pamela challenges the circuit court's order for involuntary medication on three bases. First, she argues, under the first *Sell* factor, that the State lacks an important interest in prosecuting her. Second, she asserts that the court never determined that she was incompetent to refuse medication pursuant to the double showing required under WIS. STAT. § 971.14(3)(dm). Finally, she contends that the State failed to prove, under the second *Sell* factor, "that involuntary medication is substantially likely to render [her] competent to stand trial." (Formatting altered.) We reject each of Pamela's challenges.[6]

## I. Important governmental interests

¶13    The first *Sell* factor "requires a court to 'find that *important governmental interests* are at stake.'" *J.D.B.*, 419 Wis. 2d 383, ¶12 (quoting *Sell*,

---

[6] During the hearing before the circuit court, Pamela's defense counsel stated, "I'm not gonna really argue the three [*Sell v. United States*, 539 U.S. 166 (2003),] factors that the doctor touched upon. I mean, I think it's uncontested. I'm gonna really just ho[m]e in on the first *Sell* factor." As a result, the State argues on appeal that Pamela forfeited her arguments with regard to WIS. STAT. § 971.14(3)(dm) and the second *Sell* factor because she failed to raise these arguments before the circuit court. *See Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810 ("Arguments raised for the first time on appeal are generally deemed forfeited."). In contrast, Pamela asserts that sufficiency of the evidence challenges are not subject to the forfeiture doctrine. *See State v. Hayes*, 2004 WI 80, ¶¶45-54, 273 Wis. 2d 1, 681 N.W.2d 203.

We need not decide this question because we have the authority to disregard forfeiture arguments and address an allegedly forfeited claim on the merits. *See State v. Erickson*, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999) ("[T]he [forfeiture] rule is one of judicial administration and ... appellate courts have authority to ignore the [forfeiture].").

539 U.S. at 180). "When someone is accused of a serious crime—whether against a person or property—bringing them to trial meets this threshold; it is an important governmental interest." *Id.* Nevertheless, "'[s]pecial circumstances may lessen the importance of that interest' in a particular case." *Id.*, ¶13 (citation omitted). "The ultimate legal determination," however, "does not consist in a checkbox of 'special circumstances' with fixed rules; *Sell* asks whether the state has an important interest that is not sufficiently mitigated so as to become unimportant considering 'the facts of the individual case.'" *J.D.B.*, 419 Wis. 2d 383, ¶14 (citation omitted). Whether the State has an important interest in prosecuting the accused is a question of law subject to our de novo review. *Id.*, ¶21.

¶14 "A serious crime is ordinarily enough to find an important interest." *Id.*, ¶14. However, *Sell* does not define what qualifies as a "serious crime," our supreme court's recent decision in *J.D.B.* also does not outline a framework, and the federal courts do not appear to agree on how to determine whether a crime is serious. *See State v. Lopes*, 322 P.3d 512, 525 (Or. 2014) (collecting federal cases). Pursuant to the dictionary definition, a serious crime or offense is defined as "[a]n offense not classified as a petty offense and usu[ally] carrying at least a six-month sentence." *Serious offense*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Felony*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A serious crime usu[ally] punishable by imprisonment for more than one year or by death.").

¶15 Under the circumstances of this case, we independently conclude, and agree with the circuit court, that Pamela has been accused of a serious crime and that the State has an important interest in prosecuting her. As discussed above, Pamela is alleged to have trapped and terrorized Nora by telling her that she would be "smashing the souls out of" Nora, that the "process would be painful," and that Nora should "ask for forgiveness and say goodbye to [her]

8

family." Pamela also allegedly prevented Nora from leaving Pamela's residence and from using her cell phone to seek help—after Nora was able to send her initial text message to law enforcement—which made the situation that much more dire. This behavior allegedly caused Nora distress, as law enforcement observed her "visibly shaking and holding a tissue as if she had just been crying." Pamela also resisted arrest by wrapping her legs around a stair railing, which behavior increased the risk that either she or a law enforcement officer would suffer an injury. These are serious allegations—threatening violence and pain against a mental health clinician—and, as the State argued, it has a substantial interest in prosecuting Pamela to ensure the safety of home healthcare workers. *See J.D.B.*, 419 Wis. 2d 383, ¶26.

¶16 As a result of her alleged actions, Pamela was charged with false imprisonment, which is a Class H felony, *see* WIS. STAT. § 940.30, and obstructing an officer, which is a Class A misdemeanor, *see* WIS. STAT. § 946.41(1). Accordingly, Pamela's maximum total exposure for both convictions is six years and nine months of incarceration. *See* WIS. STAT. §§ 939.50(3)(h), 939.51(3)(a). We agree that a Class H felony, with the prospect of a six-year liberty deprivation, is a serious crime.

¶17 Despite *J.D.B.* not providing a working framework for what constitutes a serious crime, our conclusion that Pamela was charged with a serious crime finds support in *J.D.B.* There, the defendant was charged with battery to a law enforcement officer, which is also a Class H felony. *J.D.B.*, 419 Wis. 2d 383, ¶4. Although the parties agreed that the crime was serious, our supreme court also concurred that "felony battering of a law enforcement officer certainly satisfies any definition of serious." *Id.*, ¶22. Like the defendant in *J.D.B.*, Pamela was

9

charged with a Class H felony, and her charges are aggravated by her additional charge for obstructing an officer.

¶18    In her reply brief, Pamela argues that "*J.D.B.* provides no guidance" because "it provided no framework for this Court, going forward." We disagree. While our supreme court "decline[d] the invitation" to "adopt a framework for determining if a crime is serious," *id.*, ¶22, it does not follow that we can learn nothing from the court's conclusion that a Class H felony is a serious crime.

¶19    Pamela also argues that her charges "are better analyzed under this Court's decision in" *State v. B.M.T.*, 2025 WI App 77, 419 Wis. 2d 330, 30 N.W.3d 516. In that case, which also involved the involuntary administration of medication to restore competency, the defendant had a robust criminal history, and he argued that the first *Sell* factor had not been met because only 2 of his 20 criminal charges were serious. *See B.M.T.*, 419 Wis. 2d 330, ¶¶1-2. We held that "[t]he nature of the criminal charges" and the defendant's "significant criminal exposure weigh heavily in" the analysis of the first *Sell* factor and "that the totality of the alleged criminal conduct may be considered when determining whether the State has an important interest in bringing a defendant to trial." *B.M.T.*, 419 Wis. 2d 330, ¶¶3, 33. Therefore, we explained, "the State's interest extends not merely to the two conceded 'serious crimes' of battery, but to the whole panoply of alleged criminal conduct." *Id.*, ¶36. Here, Pamela argues that we must consider the fact that she "faces one felony and one misdemeanor" and that "[h]er total criminal exposure includes three years and nine months of initial confinement, followed by three years of extended supervision."

¶20    We are not persuaded by Pamela's arguments with regard to *B.M.T.* That case and Pamela's case are materially factually different, and *Sell* instructs

10

that we "must consider the facts of the individual case in evaluating the Government's interest in prosecution." *See Sell*, 539 U.S. at 180; *J.D.B.*, 419 Wis. 2d 383, ¶14. Furthermore, while the case undoubtedly advocates for considering criminal charges on a collective basis, *B.M.T.* says nothing about where the floor—i.e., the shortest or least severe sentence—for serious crimes may be set and thus tells us nothing regarding false imprisonment or crimes with a six-year maximum penalty.

¶21 Finally, Pamela advocates for a bright-line rule, wherein a defendant necessarily faces serious charges when he or she is exposed to ten years' initial confinement and *may* be considered to face serious charges when he or she is exposed to five years' initial confinement. Pamela finds support for her position in federal decisions. *See, e.g.*, *United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005) (ten years' imprisonment); *see also United States v. Berry*, 911 F.3d 354, 360-62 (6th Cir. 2018) (collecting cases). Therefore, under her proposed rule, because her maximum term of initial confinement is three years, *see* WIS. STAT. § 973.01(2)(b)8., Pamela asserts that her charges should not be considered serious.

¶22 Again, our supreme court in *J.D.B.* rejected the invitation to create a framework or a bright-line rule to answer the first *Sell* question, and we do so as well. *See J.D.B.*, 419 Wis. 2d 383, ¶22. In Wisconsin, there is no bright-line rule for determining whether a criminal charge is a serious crime. "[T]he question is whether the state has an interest in prosecution that is important enough to override the defendant's liberty interest against unwanted medication," considering "the facts of the individual case." *Id.*, ¶14 (citation omitted).

¶23 We must also consider, however, whether "[s]pecial circumstances may lessen the importance of [the State's] interest" in this case. *See id.*, ¶¶13, 14

(quoting *Sell*, 539 U.S. at 180). The *Sell* Court "observed that if a defendant is facing a lengthy mental commitment in an institution, the state's interest in incarcerating an individual would be diminished (though not extinguished), presumably because the risk of re-offense is limited by the prospective mental commitment." *J.D.B.*, 419 Wis. 2d 383, ¶13. "Similarly, the state's interest could also be lessened if a defendant has already served a lengthy confinement for which he [or she] will receive significant credit toward any ultimate sentence resulting from the prosecution." *Id.* Nevertheless, our supreme court noted that "[b]y using the language 'special circumstances,' the Court communicated that such mitigating circumstances will not be ordinary." *Id.*, ¶14.

¶24 Pamela argues that special circumstances present here lessen the State's interest in prosecuting her. First, she asserts that the likelihood of her being committed again under WIS. STAT. ch. 51[7] is high because of her "continued appropriateness for commitment," the fact that she was admitted to WMHI under an order authorizing involuntary medication, and the substance of Hansen's testimony. She also argues that due to her treatment-resistant schizophrenia, it is likely that she will be required to remain inpatient during the course of any future commitment. Pamela further contends that she is entitled to approximately 232 days of sentence credit. According to Pamela, given her sentence credit, her "lack of prior criminal record, and Nora's statements … that she did not wish for Pamela to go to jail [and] that [Nora] was concerned about Pamela's mental

---

[7] An individual may be civilly committed under WIS. STAT. ch. 51 if the individual is mentally ill, a proper subject for treatment, and dangerous to himself or herself or others. *See Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277.

health, … any interest the state may have in her prosecution is diminished by the special circumstances of her case."

¶25 We conclude that Pamela has not shown the presence of sufficient special circumstances such that the State's important interest in prosecuting her has been fully mitigated. Pamela's arguments with regard to a possible future WIS. STAT. ch. 51 commitment are entirely speculative and postulate only that she might be civilly committed again because it has happened in the past. However, like the defendant in *J.D.B.*, no ch. 51 commitment proceedings had commenced for Pamela at the time of the circuit court's order in this case. *See J.D.B.*, 419 Wis. 2d 383, ¶27. Moreover, Hansen testified at the hearing that "we lost the order to treat" Pamela "on the civil side," which resulted in her decompensation, and the county was "unwilling to continue it, which is why we're now pursuing it under her current legal status with treatment to competency." Given the county's failure to pursue another civil commitment and Hansen's testimony, a potential future ch. 51 commitment appears unlikely. Therefore, "the mere possibility that [Pamela] may have faced a future commitment at the time the circuit court made its decision does little to undermine the State's interest in prosecuting [Pamela] for this serious crime."[8] *See J.D.B.*, 419 Wis. 2d 383, ¶27.

---

[8] As the State also notes, Pamela has not shown that a possible future WIS. STAT. ch. 51 commitment would result in a "lengthy mental commitment in an institution" that would reduce the State's interest in prosecuting her. *See State v. J.D.B.*, 2026 WI 5, ¶¶13, 26, 419 Wis. 2d 383, 31 N.W.3d 314. At best, all Pamela argues is that "[g]iven her ongoing medication resistance, … it is likely that she will be confined at WMHI during that commitment." However, the record belies that claim. As noted above, Brown County was resistant to hold her at WMHI during her emergency detention after this incident. Additionally, as we explained in *B.M.T.*, "ch. 51 commitments are designed to be of short duration," and "[c]ivil commitment as an outpatient is not the type of civil confinement that *Sell* contemplated would diminish the government's interest in prosecution." *State v. B.M.T.*, 2025 WI App 77, ¶40, 419 Wis. 2d 330, 30 N.W.3d 516.

13

¶26    Our supreme court in *J.D.B.* also rejected a similar argument to Pamela's with regard to her sentence credit.  There, the defendant argued that "he was unlikely to receive a long sentence, and the eight months he spent in custody would likely cover substantially all of his sentence."  *Id.*, ¶28.  The court determined that while the defendant's eight months of sentence credit had "a mitigating effect on the State's interest," that credit did not "remove the State's strong interest in prosecuting this serious crime."  *Id.*

¶27    Here, Pamela's 232 days amount to almost eight months of credit, and, again, Pamela and the defendant in *J.D.B.* were both charged with a Class H felony.  Therefore, based on *J.D.B.*, we cannot conclude that Pamela's sentence credit sufficiently mitigates the State's important interest in prosecuting her. Pamela's challenge to the first *Sell* factor fails.

## II.  Incompetent to refuse medications

¶28    Next, Pamela argues that "[e]ven if the state had an important interest in prosecuting Pamela, the circuit court nevertheless erred in ordering involuntary medication without finding … Pamela incompetent to refuse medication."  According to Pamela, "nothing in the record suggests that the circuit court ever considered Pamela's competence to refuse medication" because the court "did not mention Pamela's competency to refuse medication in its ruling."

¶29    Pursuant to WIS. STAT. § 971.14(3)(dm),[9] the circuit court was required to find that the advantages and disadvantages of the medication had been

---

[9]  As relevant here, WIS. STAT. § 971.14(3)(dm) provides as follows:

(continued)

14

explained to Pamela and that Pamela was incapable of expressing an understanding or was substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to medication to make an informed choice about whether to accept or refuse medication or treatment. *See J.D.B.*, 419 Wis. 2d 383, ¶51. We review the circuit court's statutory findings under the clearly erroneous standard. *Id.*, ¶49. "'[A]s long as the evidence would permit a reasonable person to make the same finding,' it will be affirmed on appeal." *Id.*, ¶35 (citation omitted). "We search the record not for evidence opposing the circuit court's decision, but for evidence supporting it." *Id.* (citation omitted).[10]

---

> The defendant is not competent to refuse medication or treatment if, because of mental illness, developmental disability, alcoholism or drug dependence, and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the defendant, one of the following is true:
>
> 1. The defendant is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
> 2. The defendant is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

[10] The State accuses Pamela of "erroneously muddl[ing] the standard of review" "by equating the clear error standard of review to a review of the circuit court's ruling for an erroneous exercise of discretion." Pamela also appears to argue that we may not search the record for evidence supporting the circuit court's findings based on the holding in *D.J.W.* That case held that circuit courts must "make specific factual findings with reference to the subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2. on which the recommitment is based." *D.J.W.*, 391 Wis. 2d 231, ¶40.

We disagree that the holding in *D.J.W.*, addressing recommitments under WIS. STAT. ch. 51, applies to the clearly erroneous standard of review in this restoration of competency case. Importantly, *J.D.B.* cautioned against importing holdings from ch. 51 proceedings into proceedings under WIS. STAT. § 971.14. *See J.D.B.*, 419 Wis. 2d 383, ¶53.

¶30     Under our standard of review, we conclude that Pamela's statutory challenge also fails because the record establishes both that the circuit court made the two required findings under WIS. STAT. § 971.14(3)(dm) and that these findings were not clearly erroneous.  While we agree with the State that "[t]he circuit court could have been clearer in making the findings required by … § 971.14(3)(dm), and the State should have prompted the circuit court to make express findings," we also agree that the court made a sufficient record for us to conclude that it made the appropriate statutory findings.

¶31     As to whether "the advantages and disadvantages of and alternatives to accepting the particular medication or treatment" were explained to Pamela, *see* WIS. STAT. § 971.14(3)(dm), Hansen's treatment plan outlines his attempt to discuss medications with Pamela on December 30, 2025.  The plan lists the advantages and disadvantages of several medications as well as the alternative medications that were discussed with Pamela during that conversation.  During Hansen's testimony, he also noted that when he met with Pamela, "she ha[d] been rapidly declining as far as her overall psychiatric presentation," and he "discuss[ed] or attempt[ed] to discuss restarting medications as well as trying to increase or improve [Pamela's] … ability to care for herself."

¶32     As to the second statutory finding, Hansen's treatment plan and testimony clearly outlined his medical opinion that Pamela was not competent to refuse medication or treatment.  His plan stated explicitly that Pamela was both incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives *and* substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment.  According to Hansen, "[Pamela] did not

16

demonstrate insight into her improvement on medications, and her refusal [of medications] demonstrates lack of insight into ongoing treatment." Hansen further described Pamela's response to their discussion about medications, stating that Pamela "[e]xpressed she does not need medications, and [she] made other disorganized statements that appeared delusional in thought content."

¶33 Importantly, the circuit court acknowledged on the record that it was required to make factual findings, and it effectively adopted Hansen's testimony and treatment plan for that purpose when it equated that evidence to its own findings: "I [grant the medication order] with the following findings. One being the report, multiple reports … authored by Dr. Hansen and testified by him today." The court went on to explain that "[Hansen] made all of the information that would be necessary to make these findings available to the court." By doing so, the court incorporated by reference Hansen's detailed factual analysis into its own ruling, and these facts provided a sound basis for both findings under WIS. STAT. § 971.14(3)(dm). Further, Pamela does not identify any conflicting evidence with regard to the statutory requirements and, thus, fails to identify any clear error.

**III. Substantially likely to render Pamela competent to stand trial**

¶34 Finally, Pamela argues that the State also failed to prove that involuntary medication is substantially likely to render her competent to stand trial—the second *Sell* factor. "The second *Sell* factor requires a court to find that involuntary medication *significantly furthers* the government's interest in prosecuting the offense." *J.D.B.*, 419 Wis. 2d 383, ¶30. To do so, the medication must be "substantially likely to render the defendant competent to stand trial" and be "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby

rendering the trial unfair." *Sell*, 539 U.S. at 181. Our supreme court observed that "*Sell* mandates individualized findings about the defendant's medical situation" and that the treatment cannot be "a shot in the dark," but the standard "permits flexibility in how this finding is determined and the evidence that might support it." *J.D.B.*, 419 Wis. 2d 383, ¶¶30, 33. A circuit court's determination that the State proved the second *Sell* factor is also a factual finding that we review for clear error. *J.D.B.*, 419 Wis. 2d 383, ¶35.

¶35 Pamela asserts that Hansen's "testimony failed to reach the threshold of clear and convincing evidence that involuntary medication will restore Pamela to competency" because it demonstrated "only a marginal possibility." According to Pamela, Hansen "couched" his testimony by describing the likelihood of restoring her competency as "very minimal" without medications, but he argued that with medications it "substantially improves."

¶36 The circuit court's finding that the second *Sell* factor had been satisfied is not clearly erroneous. Although Hansen acknowledged some possible limitations when it comes to treatment of mental health conditions, we have stated that "[i]t is not fatal to the treatment plan" if the medical provider cannot "guarantee" the effectiveness of a medication because "the *Sell* standard does not require certainty." *See B.M.T.*, 419 Wis. 2d 330, ¶55 (citation omitted). Hansen also conclusively opined that the proposed medications would "substantially improv[e]" the likelihood of restoring Pamela to competency. Further, as the court recognized, Pamela had taken the recommended medications while subject to a civil commitment in the past, and those medications worked to improve her thought process and make it possible to work with her treatment providers, so "there is direct evidence that has been observed as to how the medication could help her." The court's findings—i.e., that this course of treatment was

substantially likely to render Pamela competent to stand trial and substantially unlikely to have side effects that undermine the fairness of the trial—were supported by the evidence, reasonable under the circumstances, and were not clearly erroneous. We affirm the circuit court's order.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.